PER CURIAM.
Luther Douglas, who was twenty-five years old at the time of the crime, was convicted of the 1999 sexual battery and first-degree murder of eighteen-year-old Mary Ann Hobgood and sentenced to death. On direct appeal, we affirmed his convictions and sentences. See Douglas v. State, 878 So.2d 1246 (Fla.2004). Douglas now appeals the denial of his motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.851 and simultaneously petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const.
The crux of Douglas’s instant appeal is that trial counsel rendered ineffective assistance in failing to investigate and prepare for the penalty phase, and more specifically, in failing to secure and present to the jury mental health mitigation that existed at the time of trial. The postconviction court conducted an evidentiary hearing on this claim, during which Douglas’s previously undiscovered school records and testimony from two mental health professionals were received into evidence, The court subsequently denied relief. After a thorough review of both the trial and postconviction records, we agree with Douglas that trial counsel’s performance in preparation for the penalty phase was deficient. We nevertheless affirm the post-conviction court’s denial of relief because we conclude that Douglas did not demonstrate prejudice.
FACTS AND PROCEDURAL HISTORY
This Court summarized the pertinent facts underlying this crime on direct appeal as follows:
On the evening of December 25, 1999, Hobgood left her parents’ house in Jacksonville, Florida, with her friend, Misty Jones. Douglas, who was Jones’s boyfriend at the time and who had not previously met Hobgood, drove Jones to Hobgood’s house and drove away with both women in his vehicle. The vehicle Douglas was driving that night was a red Ford Escort, which belonged to Jimela Dozier, the mother of one of Douglas’s children. Jones later described the condition of the vehicle that night as dirty with trash inside and pollen and dirt on the exterior. After leaving Hobgood’s, the three first stopped at a liquor store and bought a bottle of rum and soda, which Douglas and Hobgood drank. They then went to several bars in the Jacksonville area. Around midnight, Jones indicated that she was not feeling well and Douglas drove her home. Douglas then left Jones’s house in the Escort with Hobgood.
Approximately two hours later, Douglas arrived at the apartment where he was living and asked a teenage occupant to go with him to “take care of some business.” When Douglas’s request was refused he left the apartment.
*112 Jones testified that Douglas called her in the early morning hours of December 26, first telling her that he had dropped Hobgood off at a bar and then stating that he had taken Hobgood home. When Jones saw Douglas that morning she noticed scratch marks on his neck that had not been there the previous evening. In Douglas’s presence, Jones called Hobgood’s home, and after speaking with Hobgood’s mother, learned that Hobgood had not returned home. When Hobgood’s sister called Jones sometime later that day, Jones told her that they had been out the night before with Timothy Hightower, Jones’s ex-boyfriend. Jones testified that she lied to Hob-good’s sister because Douglas was with her and she figured that something was wrong.
Jones then confronted Douglas regarding Hobgood’s whereabouts. The two went for a drive in the red Escort, which Jones noticed was newly clean inside and out. During the drive, Douglas admitted to Jones that he had beaten Hobgood and thrown her out of the car, leaving her for dead. Jones recalled that when she asked Douglas if he beat Hobgood because “she didn’t have sex with black boys,” Douglas just smiled. Douglas also told Jones that if she was questioned she should point the blame toward Hightower or she would end up like Hobgood. When police officers questioned Jones later that night she told them the same story she relayed to Hobgood’s sister — that she and Hob-good had gone out with Hightower. Jones also gave a sworn statement to that effect. Jones subsequently recanted those statements when the officers questioned her again in January 2000 and told her that they knew she had lied.
On the afternoon of December 26, 1999, Hobgood’s body was found along a set of railroad tracks. She was positioned on her back in a shrub line with her legs stretched out in front of her. Hobgood’s body was nude from the waist down, except for her black socks. Her knit top and black bra were torn and pushed up to her shoulders, exposing her breasts. A few feet from Hob-good’s body, the police found a tire lug wrench, a rubber car part and a blood soaked maroon jacket. The maroon jacket was later identified by Jones as the one worn by Douglas on December 25. A Jacksonville Sheriffs Office detective testified that the rubber car part looked identical to a part recovered from the red Ford Escort.
Associate medical examiner Dr. Matthew Areford, who went to the scene on December 26 and performed the autopsy on Hobgood on December 27, noted that Hobgood had suffered extensive injury, particularly to her head. Dr. Areford concluded that she died of blunt head trauma. Dr. Areford testified that while Hobgood was alive she received at least ten separate blows to her face, seven blows to the back of her head and seven to ten blows to her hands and arms. Her jaw and nose were broken, several of her teeth had been knocked out and her right shoulder was dislocated. Dr. Areford indicated that these injuries could have been inflicted by another person’s fist or by a hard object such as the lug wrench found at the scene. Several of the wounds on Hobgood’s arms and hands were consistent with defensive wounds.
Although Dr. Areford could not determine the sequence of the injuries inflicted on Hobgood while she was alive, he opined that it was unlikely that Hobgood was struck from behind, fell to the ground and was hit a number of times while unconscious. Dr. Areford ex *113 plained that such a scenario was inconsistent with the defensive type injuries found on Hobgood’s hands and forearm as well as with the fact that there were injuries to all sides of her head, which indicated that she was rolling from side to side.
The autopsy also disclosed extensive injuries to Hobgood’s body, in addition to those described above, which were inflicted after her death. Dr. Areford testified that these injuries were consistent with her body having been run over by the undercarriage of a ear.
During the autopsy, Dr. Areford collected a rape kit, which included a set of vaginal swabs. Further analysis of the rape kit was conducted by David George, a serology analyst employed by the Florida Department of Law Enforcement (FDLE). George testified that the vaginal swabs tested positive for the presence of semen.
Subsequent DNA testing matched the semen collected from Hobgood to Douglas....
[[Image here]]
While in jail awaiting trial, Douglas talked to fellow inmate Thomas Brown about Hobgood’s murder. During their first conversation about the murder, Douglas told Brown that he was charged with the murder of a girl and that he had run over her with a car because she would not move. However, in a later conversation Douglas stated that he ran over the girl because he had beaten her to death but wanted to make it look like a vehicular homicide. Douglas also told Brown that the State had a lot of evidence against him because he “took the pussy.” Brown testified that he understood Douglas’s statement “took the pussy” to mean that Douglas raped the girl.
Douglas, 878 So.2d at 1250-53 (footnotes omitted). Based on this evidence, the jury found Douglas guilty, by special verdict, of first-degree felony murder and a separate count of sexual battery. Id. at 1253. The jury did not find Hobgood’s murder to be premeditated. Id.
During the penalty phase, trial counsel presented the testimony of twelve lay witnesses to establish mitigation. These witnesses consisted solely of Douglas’s family and friends;[1] no mental health professionals were called to testify on Douglas’s behalf. After hearing the evidence, the jury recommended a sentence of death by a vote of eleven to one. Id. Trial counsel did not offer any additional mitigation evidence during a subsequent Spencer[2] hearing.
In sentencing Douglas to death, the trial court found two aggravating circumstances, which were assigned great weight: (1) the murder was especially heinous, atrocious, or cruel (HAC); and (2) the murder was committed in the course of a sexual battery. Id. The trial court found one statutory mitigator — that Douglas had no significant history of prior criminal activity in that he did not have a prior felony conviction — but assigned “little weight” to this mitigating circumstance because *114 Douglas had previously engaged in illegal drug activity that did not lead to arrests or convictions. Id. The trial court also considered thirty nonstatutory mitigators Douglas proposed and found that sixteen were proven,[3] but rejected the remaining mitigating circumstances as either unproven or not mitigating in nature.[4] Finding that the aggravating circumstances outweighed the mitigating circumstances, the trial court agreed with the jury’s recommendation and imposed a sentence of death. The trial court also sentenced Douglas to life imprisonment for the separate sexual battery offense. Id. at 1254 & n. 9.
On direct appeal,[5] this Court held that the trial court erred in rejecting the mitigating circumstances that Douglas was a positive, upbeat person and that he has an outgoing, friendly personality, yet conclud *115 ed that this error was harmless beyond a reasonable doubt and affirmed his convictions and sentences. Id. at 1258. In December 2005, Douglas filed an amended motion for postconviction relief, in which he raised thirty-two claims.[6] Following a *116 Huff[7] hearing, the postconviction court granted an evidentiary hearing on a portion of claim 10 (ineffective assistance of counsel in failing to investigate available mitigation evidence and present the testimony of Dr. Harry Krop during the penalty phase) and claim 18(B) (ineffective assistance of counsel in failing to present available mental health mitigation through Dr. Krop during the penalty phase). After a two-day evidentiary hearing, the post-conviction court denied relief on all thirty-two claims.
This appeal follows, and Douglas simultaneously petitions this Court for a writ of habeas corpus.
ANALYSIS
I. RULE 3.851 CLAIMS
In Douglas’s appeal to this Court, he raises three claims. He first alleges that trial counsel rendered ineffective assistance in failing to investigate and provide sufficient background information to the retained mental health expert and in failing to conduct an adequate mental health investigation and present the results of that investigation to the jury and sentencing court for the purposes of mitigation. Second, Douglas argues that rule 3.851, which imposes a one-year time limit for filing motions for postconviction relief, is unconstitutional. Lastly, he contends that Florida’s capital sentencing statute is unconstitutional. We address each claim in turn, beginning with Douglas’s ineffective assistance of counsel claim.

Ineffective Assistance of Penalty-Phase Counsel

In his first claim, Douglas raises an ineffectiveness challenge focusing on trial counsel’s performance in preparation for and during the penalty phase. He essentially contends that trial counsel were ineffective in failing to investigate and provide sufficient background information to the retained mental health expert, Dr. Krop, who conducted a preliminary psychological examination of Douglas prior to trial, and in failing to conduct an adequate investigation and present additional mitigation evidence to the jury regarding Douglas’s mental health.[8] Douglas argues that if trial counsel had conducted a reasonable investigation, then counsel would have discovered a wealth of mental health mitigation, including evidence of the statutory mitigator that Douglas suffered from an extreme emotional disturbance at the time of the crime. In addition, Douglas asserts that his trial counsel were ineffective in failing to present nonstatutory mitigation evidence, including that he suffered from chronic depression since childhood, that he was functioning within a borderline range of intelligence and had a poor school record, that he abused drugs and alcohol, and that he has frontal lobe dysfunction likely caused by organic brain damage.[9] Absent *117 such evidence, Douglas argues, his trial counsel were unable to draw a correlation between his mental health and Douglas’s commission of the crime.
Following an evidentiary hearing on this claim, the postconviction court denied relief on prejudice grounds alone, finding that the newly discovered mental health mitigation was more harmful than helpful and that even if presented, there was no reasonable probability that the balance of aggravators and mitigators would have been any different or resulted in a life sentence. For the reasons set forth below, we agree with Douglas that trial counsel rendered deficient performance. However, we affirm the postconviction court’s denial of relief because Douglas has failed to demonstrate prejudice.
In order to prevail on a claim of ineffective assistance of counsel, a defendant must show both that trial counsel’s performance was deficient and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish the deficiency prong under Strickland, the defendant must prove that “counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment.” Id. The defendant carries the burden to “overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ ” Id. at 689, 104 S.Ct. 2052 (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). “Nevertheless, it is axiomatic that ‘counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.’ ” Hurst v. State, 18 So.3d 975, 1008 (Fla.2009) (quoting Strickland, 466 U.S. at 691, 104 S.Ct. 2052).
“Penalty phase prejudice under the Strickland standard is measured by whether the error of trial counsel undermines this Court’s confidence in the sentence of death when viewed in the context of the penalty phase evidence and the miti-gators and aggravators found by the trial court.” Id. at 1013. That standard does not “require a defendant to show ‘that counsel’s deficient conduct more likely than not altered the outcome’ of his penalty proceeding, but rather that he establish ‘a probability sufficient to undermine confidence in [that] outcome.’ ” Porter v. McCollum, 558 U.S. 30, 130 S.Ct. 447, 455-56, 175 L.Ed.2d 398 (2009) (alteration in original) (quoting Strickland, 466 U.S. at 693-94, 104 S.Ct. 2052). “To assess that probability, [the Court] considers] ‘the totality of the available mitigation evidence ...’ and ‘reweighfs] it against the evidence in aggravation.’ ” Id. at 453-54 (quoting Williams v. Taylor, 529 U.S. 362, 397-98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)).
Because both prongs of the Strickland test present mixed questions of law and fact, in reviewing a trial court’s ruling after an evidentiary hearing on an ineffective assistance of counsel claim, this Court employs a mixed standard of review, deferring to the postconviction court’s factual findings that are supported by competent, substantial evidence, but reviewing the postconviction court’s application of the law to the facts de novo. Mungin v. State, 932 So.2d 986, 998 (Fla.2006). With this standard in mind, we review Douglas’s ineffectiveness claim.
The record establishes that almost two years before the commencement of Douglas’s guilt-phase proceeding, trial counsel contacted Dr. Krop, a licensed *118 psychologist, to aid in addressing Douglas’s mental state at the time of the offense and to uncover possible mitigating factors. In May 2000, Dr. Krop conducted a clinical interview with Douglas, during which he administered a battery of psychological tests. Following this evaluation, Dr. Krop issued a June 2000 report to trial counsel indicating that Douglas was competent to proceed and requesting from counsel the opportunity to review depositions, school records, police reports, prior presentence investigation reports, and any other relevant materials that might pertain to possible mitigation. The report further requested that trial counsel schedule a follow-up evaluation so that Dr. Krop could discuss the crime with Douglas and coordinate interviews with relevant family members. According to Dr. Krop’s files, he never received any of these materials from trial counsel. Dr. Krop also did not have an independent recollection of discussing this report with trial counsel over the phone, and such a discussion was never recorded in Dr. Krop’s notes.
Douglas’s two-day penalty phase began on April 4, 2002. During that proceeding, trial counsel did not present testimony from Dr. Krop or any other mental health professional, and counsel did not introduce into evidence any records relating to Douglas’s mental health, such as school or medical records. Instead, counsel presented the testimony of twelve lay witnesses, consisting of Douglas’s family and friends, to establish that Douglas was a good person who could be a productive inmate. Collectively, these witnesses tes-tilled to the following information: Douglas came from a religious, close-knit, and supportive family; Douglas’s father was strict, controlling, and physically and emotionally abusive, and he sexually molested Douglas’s older sister; Douglas’s father was forced to leave the family home when Douglas was nine or ten .years old; Douglas had difficulties in school; Douglas loves and cares for his four children, one of whom is not his biological child; Douglas worked at various jobs; Douglas is a good brother and son; and Douglas is a positive, upbeat, and friendly person.
When asked about his intellectual capacity, and more specifically, his learning disabilities, Douglas’s mother, Sheryl McKever, provided the most extensive testimony. She testified that as a child, Douglas attended special education programs, which assisted him with a reading disability and improving his math skills. Douglas entered one such program at the age of ten. McKever also explained that Douglas dropped out of school in the seventh grade due to his learning disability and that because of this disability, he did not wish to return to school. She acknowledged, however, that since dropping out of school, Douglas had taught himself to read, had begun to enjoy reading while incarcerated, and had become determined to go back to school. Aside from acknowledging his difficulty with reading, the other witnesses called on Douglas’s behalf were unaware of whether Douglas had any physical or mental disabilities and even described him as smart.[10]
*119 At the evidentiary hearing, postconviction counsel focused on trial counsel’s failure to follow up with Dr. Krop and offer additional mitigation evidence regarding Douglas’s mental health. Douglas’s school records indicated the following: he did poorly in school; while in the fourth grade, Douglas had good attendance but was of borderline intelligence with academic and behavioral problems, which appeared to be related to feelings of anxiety and poor self-concept; he repeated the second and fourth grades; he was a participant in the Exceptional Student Education program in Duval County; and he dropped out of school after apparently repeating the seventh grade several times.
Dr. Krop, who conducted neuropsycho-logical testing on Douglas in connection with postconviction proceedings, testified that he met with Douglas and reviewed his school records, which showed that Douglas had a full-scale IQ score of 75 when he was ten years old — a score consistent with IQ testing Dr. Krop conducted on Douglas in 2000 and similar to the IQ score of 77 Douglas had recently received. Dr. Krop opined that Douglas showed impairment consistent with frontal lobe deficits, which would typically result from some type of brain damage, and that Douglas would have presented with a serious emotional or psychological disturbance due to his self-reported alcohol abuse and ongoing conflict with his girlfriend around the time of the offense. Dr. Krop was unable to recall why neuropsychological testing was not conducted on Douglas prior to trial.
Dr. Ernest Miller, a forensic psychiatrist who examined Douglas in connection with postconviction proceedings and relied on self-reporting and “sparse” jail clinic records, testified to the following mitigation: Douglas was the product of a dysfunctional home that included extreme violence and a father who was a strict disciplinarian; his lifestyle was characterized by intermittent violent behavior and the sale of drugs, which led to his incarceration; his behavior interfered with his ability to do well in school; Douglas attempted to earn his GED, but his intellectual capacity may have been a factor in his failing to do so; he suffered from alcohol and drug dependency, depression, and a personality disorder not otherwise specified; and he suffered from an extreme mental and emotional disturbance at the time of the offense due to his violent childhood and drug use.
Trial counsel Refik Eler and Ruth Ann Hepler had no independent recollection of their preparation for the penalty phase, and during the evidentiary hearing, they noted that their files on this case were missing pertinent records. Eler testified that at the time of trial, Douglas seemed very bright and intelligent, but Eler could not recall whether he received school records showing that Douglas had an IQ of 75. Likewise, Hepler did not recall if anyone had indicated whether Douglas had cognitive difficulties or did not do well in school, vaguely remembered that Douglas never graduated, stated that it would “shock” her to learn that Douglas had an IQ of 75, and could not remember finding any history of alcohol or substance abuse. As to Dr. Krop’s pretrial evaluation, Eler believed that he had one, or possibly more, telephone conferences with Dr. Krop and recalled a letter or memorandum and a request for additional records. However, Eler was unable to remember the substance of those conversations, and his billing records only reflected that he had con *120 ducted one review of Dr. Krop’s June 2000 report. In addition, when questioned about whether the defense considered conferring with another expert other than Dr. Krop, Eler responded, “I don’t think I did.”
Due to the lack of records or an independent recollection, trial counsel speculated as to the defense strategy for failing to obtain evidence regarding Douglas’s mental health. According to Eler, if Dr. Krop indicated that Douglas had antisocial personality disorder or any other sociopathic history, he probably would have recommended that Hepler not put on that evidence of mental health mitigation because of its negative implications. On this issue, Eler specifically explained:
[Biased on the fact that nothing else was done regarding Dr. Krop, it seems to me to suggest, and once again I have no independent recollections in writing here but it seems to me that antisocial personality disorder came up. That is a red herring to me having been doing this for 20 years. I believe I conveyed my concerns to Ms. Hepler and I think based on that, we chose not to pursue school records or anything after that for that reason because to me having a jury hear about the antisocial personality disorder along with — in the guilt phase, that the facts and circumstances surrounding Ms. Hobgood’s death, or actions right before her death, that concerned me with the antisocial just from the get-go.
Along similar lines, Hepler agreed that hypothetically, presenting Douglas’s criminal history and antisocial personality traits, although coupled with Dr. Krop’s beneficial testimony, would have been inconsistent with the defense strategy to portray Douglas as a “good guy” and thought that it would be ill-advised to present evidence inconsistent with that strategy. Despite counsel’s speculation, nothing in the trial record or counsel’s records show that counsel were aware of the negative implications associated with the expert testimony or if Dr. Krop relayed such concerns to them beforehand.
It appears that counsel, at a minimum, performed a background investigation into Douglas’s social history in preparation for the penalty phase. However, it is undisputed that the pretrial report Dr. Krop issued to counsel requested the opportunity to review additional information from counsel, as well as to schedule a follow-up evaluation to discuss the crime with Douglas and coordinate interviews with his family members. Other than billing records, which reflect only one review by counsel of Dr. Krop’s preliminary report, nothing in the record shows that counsel followed up with Dr. Krop’s requests, investigated whether Dr. Krop could testify to the existence of any mental health mitigation, were informed by Dr. Krop of information that would be harmful to the defense, or attempted to secure another mental health expert to conduct an evaluation of Douglas. Nor did trial counsel introduce any records concerning Douglas’s mental health during the penalty phase.
While “Strickland, does not require counsel to investigate every conceivable line of mitigating evidence ... [or] present mitigating evidence at sentencing in every case,” Wiggins v. Smith, 539 U.S. 510, 538, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), “an attorney has a strict duty to conduct a reasonable investigation of a defendant’s background for possible mitigating evidence,” State v. Riechmann, 777 So.2d 342, 350 (Fla.2000). “Among the topics that counsel should consider presenting in mitigation are the defendant’s medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cul *121 tural influences.” Parker v. State, 3 So.3d 974, 985 (Fla.2009). As to counsel’s duty of securing evidence of mental health mitigation, this Court has recognized that “[w]here available information indicates that the defendant could have mental health problems, ‘such an evaluation is fundamental in defending against the death penalty.’ ” Jones v. State, 998 So.2d 573, 583 (Fla.2008) (quoting Arbelaez v. State, 898 So.2d 25, 34 (Fla.2005)). In light of its significance, “a reasonable investigation into mental mitigation is part of defense counsel’s obligation where there is any indication that the defendant may have mental deficits.” Hurst, 18 So.3d at 1010 (emphasis added).
The testimony of Douglas’s penalty-phase witnesses demonstrates counsel must have known, at the very least, that Douglas had difficulty reading, was placed in a special academic program, dropped out of school in the seventh grade due to a learning disability, and had a father who was physically and emotionally abusive. Despite having access to this information, there is no evidence that counsel sought to further investigate Douglas’s mental health either by seeking background records or by consulting with a mental health expert. In fact, even after Dr. Krop’s request for additional materials, the record does not disclose that counsel made any effort to provide Dr. Krop with readily available evidence. Certainly, counsel should not have considered Dr. Krop’s competency evaluation as “a reliable substitute for a thorough mitigation evaluation.” Ponticelli v. State, 941 So.2d 1073, 1096 n. 24 (Fla.2006) (quoting Arbelaez, 898 So.2d at 34); id. at 1095-96 (noting that counsel should not have considered a mental health expert’s fifteen-minute competency evaluation conducted prior to trial as a reliable substitute for a thorough mitigation evaluation). We conclude that there were sufficient facts in this case to place counsel on notice that further investigation of mental health mitigation was necessary. Consequently, counsel’s failure to investigate this line of defense was not reasonable under prevailing professional norms.
The State contends that counsel’s failure to present mental health mitigation evidence to the jury was “a sound strategic decision made after investigation by two very experienced trial counsel” and that “after investigation, trial counsel decided to put on family background testimony that would put Douglas in the best light possible.” According to the State, trial counsel made a reasonable, strategic decision to not put on mental health testimony because if they had, the jury would have also heard evidence of Douglas’s antisocial personality traits, including a life of lawlessness, indifference to the rights of others, illegal drugs, and violence. This position, however, is unsupported by the record.
This Court has indeed recognized that “[t]rial counsel is not deficient where he makes a reasonable strategic decision to not present mental mitigation testimony during the penalty phase because it could open the door to other damaging testimony.” Dufour v. State, 905 So.2d 42, 57 (Fla.2005) (alteration in original) (quoting Griffin v. State, 866 So.2d 1, 9 (Fla.2003)). However, “[c]ase law rejects the notion that a ‘strategic’ decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.” Rose v. State, 675 So.2d 567, 573 (Fla.1996) (quoting Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir.1991)). The United States Supreme Court has also “rejected any suggestion that a decision to focus on one potentially reasonable trial strategy ... [is] ‘justified by a tactical decision’ when ‘counsel [does] not *122 fulfill their obligation to conduct a thorough investigation of the defendant’s background.” Sears v. Upton, 561 U.S. 945, 130 S.Ct. 3259, 3265, 177 L.Ed.2d 1025 (2010) (quoting Williams, 529 U.S. at 396, 120 S.Ct. 1495).
Although counsel lacked an independent recollection of their investigation in preparation for the penalty phase, there is no evidence, aside from billing records denoting the receipt of Dr. Krop’s preliminary report, to support the State’s contention that trial counsel conducted any type of investigation into Douglas’s mental health or made a reasonable strategic decision based upon that investigation. This is not a case where the record discloses that trial counsel was aware of, but rejected, possible mitigation in favor of a more beneficial strategy. Cf. Cullen v. Pinholster, — U.S. -, 131 S.Ct. 1388, 1404-06, 179 L.Ed.2d 557 (2011) (holding that even though trial counsel had “no recollection” of his preparation for the penalty phase, the record supported the idea that counsel acted strategically due to counsel’s statements in the trial record, billing records showing that counsel spent considerable time investigating mitigating evidence, and counsel’s pretrial consultation with the defendant’s mother and a psychiatrist, who provided unhelpful or unfavorable information). Furthermore, we can find no strategic basis for failing to submit into evidence Douglas’s school records. We therefore conclude that counsel rendered deficient performance under the first prong of Strickland.
Having made this determination, we must next decide whether Douglas has demonstrated that counsel’s deficient performance prejudiced him. “That showing requires [Douglas] to establish ‘a reasonable probability that a competent attorney, aware of [the available mitigating evidence], would have introduced it at sentencing,’ ” Wong v. Belmontes, 558 U.S. 15, 130 S.Ct. 383, 386, 175 L.Ed.2d 328 (2009) (second alteration in original) (quoting Wiggins, 539 U.S. at 535, 123 S.Ct. 2527), and that had the jury been confronted with this mitigating evidence, it would establish a probability sufficient to .undermine confidence in the outcome, see Porter, 130 S.Ct. at 455-56.
We accept Douglas’s argument that the admission of his school records, denoting his educational and emotional problems and low IQ score, could have prevented the State from arguing in its closing that he was an individual who “chose not to finish school” and “made no effort to go back and get his education even though he could have.” [11] We also accept his claim that the expert testimony offered during postcon-viction, if presented at trial, could have assisted counsel in providing a reason why Douglas’s mental health played a role in his decision to commit the crime. We *123 therefore agree with Douglas that the testimony offered by Drs. Miller and Krop could have supported the existence of statutory mitigation and additional nonstatuto-ry mitigation regarding his mental health. It is clear that the new mitigation evidence addressed Douglas’s mental state, sought to explain his behavior, and placed his criminal conduct in some favorable context.
However, the United States Supreme Court has instructed that under Strickland, “the reviewing court must consider all the evidence — the good and the bad — when evaluating prejudice.” Wong, 130 S.Ct. at 390. Therefore, in evaluating prejudice, “it is necessary to consider all the relevant evidence that the jury would have had before it if [counsel] had pursued the different path — not just the mitigation evidence [counsel] could have presented, but also the ... evidence that almost certainly would have come in with it.” Id. at 386. In other words, the likelihood of the proposed mitigating evidence opening the door to damaging evidence is an important factor to consider in assessing whether confidence in the outcome is undermined. See id. at 389-90.
Following the Supreme Court’s guidance, we have previously held that the failure to present mental health mitigation evidence coupled with damaging or harmful information does not necessarily result in prejudice. See, e.g., Jones, 998 So.2d at 585 (finding no prejudice where available mental health mitigation, which included information that defendant suffered from antisocial personality disorder and negative character traits, proved to be a “double-edged sword” that was “more harmful than helpful”); Reed v. State, 875 So.2d 415, 437 (Fla.2004) (“An ineffective assistance claim does not arise from the failure to present mitigation evidence where that evidence presents a double-edged sword.”).
Relying on this precedent, the postcon-viction court found in this case that the mitigation evidence presented during post-conviction would have been more harmful than helpful. This finding is supported by competent, substantial evidence. Dr. Miller, who testified at the evidentiary hearing, diagnosed Douglas with a personality disorder characterized by self-centeredness, a lack of empathy, problems with restraint and inhibitions, and violent behavior with little regard for the well-being of others. Further, Dr. Miller detected antisocial personality traits in Douglas and described him as a “dangerous man” who was prone to act excessively and violently in response to minor incidents. See Jones, 998 So.2d at 585 (“This Court has acknowledged that antisocial personality disorder ‘is a trait most jurors tend to look disfavor-ably upon.’ ” (quoting Freeman v. State, 858 So.2d 319, 327 (Fla.2003))).
Dr. Miller also testified that a person with the characteristics that Douglas exhibits could overreact and get exceptionally angry if rejected sexually. The postconviction court found this last fact “particularly significant in light of Misty Jones’ testimony at trial that [Douglas] told her that he beat the victim because she ‘disrespected him’ and that when she asked him if he did it because the victim wouldn’t have sex with ‘black boys’ he just smiled at her.”[12] Like Dr. Miller, Dr. Krop also explained at the evidentia-ry hearing that although he was unsure if Douglas met the full criteria for antisocial personality disorder, he probably would have diagnosed Douglas with some type of personality disorder with antisocial and psychopathic traits. See Looney v. State, 941 So.2d 1017, 1028-29 (Fla.2006) (“This Court has noted that a diag *124 nosis as a psychopath is a mental health factor viewed negatively by jurors and is not really considered mitigation.”).
In addition to these negative characteristics, the inclusion of this expert testimony during the penalty phase would have also opened the door to evidence of Douglas’s involvement in the sale of drugs, his history of violence, including an incident where he pulled a gun on the mother of one of his children because she had “nagged him,” and his criminal history, including a rape charge that had been dropped, two domestic violence convictions, a drive-by shooting charge that had been dropped, and drug charges. See Evans v. State, 946 So.2d 1, 13 (Fla.2006) (finding that the defendant failed to establish prejudice where the mental health evidence would have opened the door to evidence of a long history of behavior problems and escalating violence). Douglas’s additional history of crime and violence, which seemed to be characterized by violence towards women, is especially damaging considering that the jury had already convicted Douglas of sexual battery during the guilt phase. As the post-conviction court concluded, “[s]uch evidence would not have been mitigating in nature and would have contradicted the evidence of [Douglas’s] good character presented by the defense.” Thus, the new testimony would have triggered the admission of highly unfavorable evidence in rebuttal and would serve to undercut the mitigation value of the testimony already presented during the penalty phase; it was a virtual certainty that Douglas’s “good” mitigation evidence would have led to the introduction of “bad” evidence. Wong, 180 S.Ct. at 390. As the Supreme Court observed in Wong, “[t]his evidence would have made a difference, but in the wrong direction.” Id. at 388.
Further, there was significant aggravation. The trial court found and gave great weight to two statutory aggravators, HAC and commission during a sexual battery, which were left undisturbed by this Court on direct appeal. The trial court also found one statutory mitigator and sixteen nonstatutory mitigators. Of relevance, the trial court found that the penalty-phase evidence established the following: Douglas was abused by his father both psychologically and physically; he witnessed his father commit acts of domestic violence upon his mother; his father was arrested for child abuse after beating him with a belt; his father sexually abused his oldest sister for seven years and was eventually arrested for the crime; the revelation of the sexual abuse of Douglas’s oldest sister had a devastating impact on Douglas; he was diagnosed with learning disabilities in the second grade; and he never finished high school. In turn, the postconviction court found that had trial counsel presented the postconviction mental health mitigation evidence during the penalty phase, it would have been entitled to “little weight.” We agree.
During the postconviction proceedings, Douglas’s mental health experts did not provide compelling testimony. Dr. Miller’s diagnosis of Douglas was based on Douglas’s own self-report, a review of “rather sparse” jail clinic records, and a two-hour interview that took place a day before the evidentiary hearing; he admitted that this time-frame was not enough for him to make any in-depth findings and that his “impression” was “subject to change.” Dr. Miller conceded that he did not review the testimony of Douglas’s twelve penalty-phase witnesses and did not receive from Douglas any real details of his involvement in the actual crime, but he nevertheless opined that Douglas suffered from an extreme mental and emotional disturbance at the time of the offense. *125 Moreover, one basis for Dr. Miller’s opinion was the abuse that Douglas suffered at the hands of his father — a fact that was cumulative to information related to the jury during the penalty phase.[13] See Dufour, 905 So.2d at 61 (holding that defendant failed to demonstrate prejudice under Strickland, where additional mitigating evidence “did not substantially differ from that presented during the penalty phase”).
Like Dr. Miller, Dr. Krop also did not review the penalty-phase testimony. Dr. Krop testified that he could not definitively say whether Douglas had brain damage and actually acknowledged that Douglas was not mentally retarded, did not suffer from any major mental illness, and did not meet the statutory mitigator that Douglas’s capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired.
As to Douglas’s school records, although they were more explicit than his mother’s testimony, we find that most of the information contained therein was merely cumulative to the facts to which his mother testified during the penalty phase. In other words, the jury had already heard evidence from which it could arrive at a rough estimate of Douglas’s low intelligence. See Arbelaez, 898 So.2d at 36-37 (acknowledging that expert testimony relating to Arbelaez’s low intelligence would have been “vastly preferable and that counsel was deficient in failing to arrange for such testimony,” but nevertheless concluding that there was no prejudice by discounting, in part, Arbelaez’s uncontested evidence of his low intelligence since the jury had already heard evidence from which to con-elude that defendant had a low intelligence level). We also note that the jury heard conflicting testimony on this issue from Douglas’s family and friends who testified that Douglas was smart, had started to enjoy reading in prison, and hoped to obtain his GED. Douglas did not put on any evidence to suggest that such testimony would have been different following a more thorough investigation by trial counsel.
In sum, while we agree with Douglas that there clearly was mental health mitigation available that went uncovered, the noncumulative evidence Douglas contends counsel should have investigated and presented in this case falls short of the type of evidence that has been previously held to be sufficient to satisfy the prejudice prong. For example, the new mitigation in this case is distinguishable from that discussed in the United States Supreme Court’s decision in Porter, where evidence introduced during postconviction proceedings showed that if Porter’s counsel had conducted any type of investigation and presentation of mitigating evidence, the judge and jury would have learned of “(1) Porter’s heroic military service in two of the most critical — and horrific — battles of the Korean War, (2) his struggles to regain normality upon his return from war, (3) his childhood history of physical abuse, and (4) his brain abnormality, difficulty reading and writing, and limited schooling.” Porter, 130 S.Ct. at 454. This evidence stood in contrast to the mitigation presented during Porter’s original penalty phase through the testimony of only one witness and the reading of a deposition excerpt, which revealed inconsistent testimony about Porter’s be *126 havior when intoxicated and that Porter had a good relationship with his son. Id. at 449. The Court noted that the “judge and jury ... heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability,” and the sentencing court found no mitigation. Id. at 454.
This case is likewise distinguishable from Rompilla v. Beard, 545 U.S. 374, 390-93, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), where Rompilla’s counsel failed to discover or present evidence that Rompilla (1) had test results pointing to schizophrenia, fetal alcohol syndrome, and mental development problems, (2) was beaten by his father with fists, leather straps, belts, and sticks, (3) was locked in a small wire mesh dog pen filled with excrement, (4) was not allowed to visit other children or speak on the phone, and (5) lived without indoor plumbing, slept in an unheated attic, and attended school in rags, id. at 390-93, 125 S.Ct. 2456, all of which “add[ed] up to a mitigation case that [bore] no relation to the few naked pleas for mercy actually put before the jury,” id. at 393, 125 S.Ct. 2456. This case also does not compare to Wiggins, where at sentencing, trial counsel offered no evidence of Wiggins’s life history, which included (1) being left alone for days at a time with no food, forcing him to beg for food and eat paint chips and garbage, (2) beatings for breaking into the locked kitchen, and (3) being passed among various foster homes, where he was physically abused and also suffered repeated molestations, rapes, and gang-rapes. 539 U.S. at 516-17, 534-35, 123 S.Ct. 2527.
In contrast to the above eases, when we examine all of the evidence in mitigation in this case, both that presented at the penalty phase and during postconviction proceedings, together with the aggravating evidence, we conclude that Douglas has not carried his burden of demonstrating prejudice. Accordingly, we affirm the postconviction court’s denial of this claim.

One-Year Time Limit

In his next claim, Douglas asserts that the one-year filing requirement for post-conviction relief in capital cases is unconstitutional because it violates his rights of due process, equal protection, effective assistance of postconviction counsel, access to courts, and to petition for a writ of habeas corpus.[14] This Court has on prior occasions rejected claims similar to those raised here. See, e.g., Seibert v. State, 64 So.3d 67, 84 (Fla.2010) (rejecting claim that one-year time limit imposed under rule 3.851 is unconstitutional); Vining v. State, 827 So.2d 201, 215 (Fla.2002) (denying claim that one-year time limit to file a motion to vacate judgment and sentence is unconstitutional because it violated the defendant’s rights of due process, equal protection, and to petition for a writ of habeas corpus; noting that a claim of ineffectiveness of postconviction counsel based on the one-year deadline does not present a valid basis for relief); Arbelaez v. State, 775 So.2d 909, 919 (Fla.2000) (denying claim that one-year time limit imposed on capital defendants under rule 3.851 is unconstitu *127 tional). We therefore deny relief on this claim.

Florida’s Capital Sentencing Scheme

In his next claim, Douglas argues that Florida’s capital sentencing statute is unconstitutional for a variety of reasons.[15] Without raising any novel issues regarding lethal injection, Douglas also contends that execution by electrocution or lethal injection imposes unnecessary physical and psychological torture and constitutes cruel and unusual punishment under the Eighth Amendment. However, he is procedurally barred from raising these substantive claims because he could and should have raised them on direct appeal, but he failed to do so. See, e.g., Jones v. State, 928 So.2d 1178, 1182 n. 5 (Fla.2006) (holding that similar claims challenging Florida’s death penalty statute are procedurally barred because they should have been raised on direct appeal).
Additionally, Douglas asserts that Florida’s capital sentencing scheme is unconstitutional pursuant to Ring and Apprendi v. New Jersey, 580 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). This claim is also procedurally barred because it was raised and decided adversely to Douglas on direct appeal. See Douglas, 878 So.2d at 1263-64.
To the extent that Douglas argues that he received ineffective assistance of counsel because trial counsel failed to properly preserve these issues, a defendant may not attempt to circumvent the procedural bar to his claims by raising conclusory allegations of ineffective assistance of counsel. See Miller v. State, 926 So.2d 1243, 1260-61 (Fla.2006). As to the remainder of the issues Douglas raises regarding Florida’s capital sentencing scheme,[16] he failed to raise those claims in the postconviction court below, and they are therefore procedurally barred. See Green v. State, 975 So.2d 1090, 1104 (Fla.2008) (rejecting claim raised on appeal because “it was neither raised in [the defendant’s] 3.851 motion nor addressed by the trial court”).
Finally, with respect to Douglas’s various claims regarding the constitutionality of Florida’s lethal-injection process and protocol, we previously rejected similar contentions in Lightbourne v. McCollum, 969 So.2d 326, 349-53 (Fla.2007), and Douglas has not made any additional alle *128 gations that would call into question the State’s current principal method of execution.
Accordingly, we deny relief on all aspects of this claim.
II. HABEAS CORPUS PETITION
In his habeas corpus petition, Douglas argues that certain omissions by his appellate counsel on direct appeal constituted ineffective assistance of appellate counsel. Claims of ineffective assistance of appellate counsel are appropriately presented in a petition for writ of habeas corpus. Chavez v. State, 12 So.3d 199, 213 (Fla.2009). To grant habeas relief on the basis of ineffectiveness of appellate counsel, this Court must resolve the following two issues:
[W]hether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Bradley v. State, 33 So.3d 664, 684 (Fla.2010) (alteration in original) (quoting Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986)). Under this standard, “[t]he defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based.” Anderson v. State, 18 So.3d 501, 520 (Fla.2009) (quoting Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000)). Importantly, “[i]f a legal issue ‘would in all probability have been found to be without merit’ had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel’s performance ineffective.” Walls v. State, 926 So.2d 1156, 1175-76 (Fla.2006) (quoting Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000)).

Use of Demonstrative Aids During Jury Deliberations

With his first habeas claim, Doug-lás argues that appellate counsel rendered ineffective assistance in failing to challenge on appeal the trial court’s error in allowing the jury, over Douglas’s objection, to take demonstrative aids into the jury room, which listed and defined in an enlarged format the two proposed aggravating circumstances the State sought to prove— HAC and commission during a sexual battery. Douglas contends that these “blowups” placed an improper emphasis on the State’s proposed aggravators, especially in light of the fact that a curative instruction announcing that these aids were not evidence was never issued and that a similar aid reflecting the defense’s proposed miti-gators was never offered.[17] This claim is without merit.
Florida Rule of Criminal Procedure 3.400 limits the items that a trial judge may send back to a jury retiring for deliberations.[18] Under its plain language, rule *129 3.400 lists the items the jury is permitted to have in the jury room, and it fails to include demonstrative aids not entered into evidence. However, even if we were to assume that it was error for the trial court to submit the State’s demonstrative aids to the jury during its deliberations, we would nevertheless conclude that this was harmless beyond a reasonable doubt. See Barnes v. State, 970 So.2d 332, 339 — 41 (Fla.2007) (applying harmless error standard to trial court’s erroneous submission of inadmissible transcript of defendant’s statement to the jury during deliberations). Before granting the jury’s request to review such aids, the trial court ensured that the wording on each item mirrored verbatim the instructions to which the jury already had access. In addition to these aids, the jury was provided with a copy of the complete instructions. The commonsense conclusion is that the jury requested these aids to make it easier for all the jurors to review the aggravating circumstances simultaneously. In light of these circumstances, any error was harmless, and therefore appellate counsel cannot be deemed ineffective for failing to raise this meritless issue on appeal.[19]

State’s Guilt-Phase Closing Argument

In his second and final habeas claim, Douglas argues that appellate counsel was ineffective in failing to challenge twenty comments the prosecutor made during his guilt-phase closing argument. He essentially contends that the prosecutor’s guilt-phase closing was improper because at various times, it questioned the competency of defense counsel, sarcastically derided the defendant and the defense’s theory, and expressed personal opinions on the merits of the defendant’s case. This claim is without merit. During the prosecutor’s closing, trial counsel did not contemporaneously object to any of the allegedly improper comments and thus failed to preserve the issue for appellate review. Appellate counsel could not be successful on appeal unless the arguments were improper and constituted fundamental error. See Derrick v. State, 983 So.2d 443, 463 (Fla.2008). In this case, however, because the prosecutor’s comments were either proper or did not rise to the level of fundamental error, appellate counsel was not ineffective for failing to raise this issue on appeal. We therefore deny relief on this claim.
*130 CONCLUSION
Based on the foregoing, we affirm the postconviction court’s denial of relief, and we also deny Douglas’s habeas petition.
It is so ordered.
CANADY, C.J., and PARIENTE, LABARGA, and PERRY, JJ., concur.
LEWIS, J., concurs in result only with an opinion, in which QUINCE, J., concurs.
POLSTON, J., concurs in result.

. These twelve witnesses included: (1) Charlie McCloud, Douglas’s brother-in-law; (2) Janice Williams, Douglas’s maternal aunt; (3) John Williams, Douglas’s uncle by marriage; (4) Tammy Wright, a close friend of Douglas’s; (5) Joyce Douglas, Douglas’s sister-in-law; (6) Sandra Wright, a friend of the family; (7) Lavem Montgomery, Douglas’s brother-in-law; (8) Matthew McKever, Douglas’s stepfather; (9) James Douglas, Douglas's brother; (10) Lavonia Montgomery, Douglas’s sister; (11) Roy Smith, Douglas’s maternal uncle; and (12) Sheryl McKever, Douglas's mother.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. The trial court found the following nonstat-utory mitigation:
(I) Douglas has a close-knit, religious family (little weight); (2) Douglas’s family supports him even after his conviction (little weight); (3) Douglas was abused by his father both psychologically and physically (little weight); (4) Douglas witnessed his father commit acts of domestic violence against his mother (little weight); (5) Douglas and his siblings were afraid of their father when they were children (little weight); (6) Douglas's father was arrested for child abuse after beating Douglas with a belt (little weight); (7) Douglas’s father sexually abused Douglas’s oldest sister for seven years and was eventually arrested for the crime (little weight); (8) the revelation of the sexual abuse of Douglas's oldest sister had a devastating impact on Douglas and the rest of his family (little weight); (9) Douglas has an interest in the scriptures (little weight); (10) Douglas was helpful to his father around the house (little weight); (II) Douglas was diagnosed with learning disabilities in the second grade (very little weight); (12) Douglas never finished high school (very little weight); (13) Douglas has made plans for self-improvement since his incarceration, including obtaining his GED (little weight); (14) Douglas can be rehabilitated (moderate weight); (15) Douglas can be a productive inmate in prison (moderate weight); and (16) Douglas exhibited appropriate behavior during the trial (little weight).
Id. at 1254.

. The trial court rejected the following mitigating circumstances as either unproven or not mitigating in nature:
(1) Douglas's father left the home when Douglas was nine years old (not mitigating); (2) Douglas's father did not spend a significant amount of time with Douglas after he left the home (not mitigating); (3) Douglas loves his children (not proven); (4) Douglas is a good father to his children (not proven); (5) Douglas supports his children by buying food, diapers and other items (not proven); (6) Douglas is a positive, upbeat person (not proven); (7) Douglas has worked at several different jobs (not mitigating); (8) Douglas has an outgoing, friendly personality (not proven); (9) Douglas is and always has been respectful to his elders (not proven); (10) Douglas has been a good son to his mother and is protective of her (not proven); (11) Douglas has been a good brother to his siblings (not proven); (12) Douglas was impaired by alcohol at the time of the crime (not mitigating); (13) Douglas has been courteous and pleasant to the courtroom personnel (not proven); and (14) codefendant Misty Jones entered a guilty plea to the charge of accessory after the fact and will receive a maximum sentence of seven years’ imprisonment (not proven).
Id. at 1254 n. 8.

.Douglas raised the following claims on direct appeal:
(1) the trial court erred in allowing the introduction of enlarged crime scene and autopsy photographs; (2) the trial court erred in rejecting several proposed mitigating circumstances and in assigning little weight to the mitigating circumstances related to Douglas's abusive childhood; (3) the trial court erred in instructing the jury on and in finding HAC; (4) Douglas's death sentence is not proportionate; and (5) Florida’s capital sentencing procedure is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
Id. at 1254'.

. Although Douglas lists his postconviction claims numerically from one to thirty-five, there are actually only thirty-two claims because he misnumbers several of the claims. The postconviction claims Douglas raised below were as follows: (1) Florida Rule of Criminal Procedure 3.851 is unconstitutional because it requires that Douglas file a motion one year after his conviction becomes final and denies Douglas effective assistance of counsel, access to the courts, and the right to petition for a writ of habeas corpus; (2) the HAC aggravator was improperly found; (3) Florida’s statutory scheme regarding aggravating circumstances is unconstitutional on its face and as applied; (4) Douglas is innocent of first-degree murder and was denied an adversarial testing because he was not at the murder scene; (5) newly discovered evidence of mitigation establishes that Douglas’s capital conviction and sentence are constitutionally unreliable; (6) Douglas is innocent of the crime and his conviction and sentence should be reversed due to inadequate aggravating circumstance instructions and a disproportionate sentence; (7) the prosecutor imper-missibly suggested to the prospective jury during voir dire that the law required that it recommend a sentence of death, and trial counsel rendered ineffective assistance in failing to object or move for a mistrial; (8) Florida Rule of Professional Conduct 4-3.5(d)(4) is unconstitutional; (9) the trial court’s jury instruction implied that the trial court believed Douglas was guilty and violated his rights; (10) trial counsel rendered ineffective assistance during the penalty phase in failing to present the testimony of "star penalty phase witnesses,” including Dr. Harry Krop, who requested a follow-up conference with Douglas, which was never granted; (11) Florida's capital sentencing statute and death by electrocution or lethal injection are unconstitutional; (12) Douglas’s constitutional rights were violated because no reliable transcript of his capital trial was produced and therefore appellate review was impossible; (13) the State introduced gruesome and shocking photographs in violation of Douglas’s constitutional rights; (14) trial counsel rendered ineffective assistance in failing to adequately question potential jurors about their views on the death penalty, to ensure an impartial jury, to discover and remove biased jurors, and to preserve this issue for appeal; (15) the trial court erroneously instructed the jury on the standard by which to assess expert testimony in violation of Douglas’s constitutional rights; (16) the trial court improperly rejected nonstatutory mitigation; (17) the State improperly argued nonstatutory aggravating circumstances; (18)(A) the jury was improperly informed of its role in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); (18)(B) trial counsel was ineffective in failing to investigate and present mental health mitigation evidence, including Douglas’s substance abuse and the child abuse he suffered, organic dysfunction, and mental disability, in failing to provide background information to and ask relevant questions of the expert who was available, in failing to object to leading questions by the State on direct, and in failing to challenge a critical State witness; (19) trial counsel rendered ineffective assistance in failing to adequately employ the services of the available mental health expert, Dr. Krop, for possible brain damage defenses; (20) the jury was unconstitutionally instructed on aggravating circumstances; (21) the jury improperly considered victim impact information; (22)(A) the trial court improperly shifted to Douglas the burden of proving whether he should receive a death sentence; (22)(B) the jury was misled and incorrectly informed about its role at capital sentencing in violation of Douglas’s constitutional rights; (23) the trial court erred in permitting the State to argue lack of remorse; (24) the State withheld material exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (25) cumulative error occurred in this case; (26) counsel rendered ineffective assistance in failing to allow the mental health expert, Dr. Krop, to conduct additional testing of Douglas and to testify about mental health mitigation; (27) trial counsel rendered ineffective assistance throughout the trial; (28) the State violated Brady by withholding evidence from the defense; (29) Florida's capital sentencing statute is unconstitutional under Ring and counsel rendered ineffective assistance per se under United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), in *116 failing to present mental health evidence through Dr. Krop; and (30) Douglas’s death sentence was disproportionate.

. Huff v. State, 622 So.2d 982 (Fla.1993).

. Douglas does not argue that he was denied a competent mental health evaluation in violation of the principles enunciated in Ake v. Oklahoma, 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Even if he did, such a claim would be procedurally barred because it could and should have been presented on direct appeal. See Davis v. State, 928 So.2d 1089, 1122 (Fla.2005) (holding Ake claim procedurally barred because it could have been raised on direct appeal).

.Douglas also asserts that had counsel presented the testimony that Douglas has an IQ score of 75 and suffers from frontal lobe impairment, it is likely that the court would have found that the statutory mitigator that his mental, emotional, or intellectual age at the time of the crime was far below his chronological age. However, no testimony to this *117 effect was offered during the postconviction proceedings.

. Douglas’s brother, James Douglas, testified that although Douglas did not have any learning difficulties as a child, he could not read and write as well as he should have been able to. James was unaware of any learning difficulties that would prevent Douglas from finishing school, but did acknowledge that because of Douglas’s educational level, Douglas did not have many employment opportunities. Douglas also expressed to James a desire to finish his education and pursue a career after earning his diploma or GED. Douglas's sister, Lavonia Montgomery, agreed with the prosecutor that Douglas was very smart. She also agreed that if Douglas had chosen to pursue his education he would have done so, but she *119 acknowledged that it would have been more difficult for Douglas to do so in light of his reading and writing problems.

. The State, in its closing, argued as follows: Douglas's siblings grew up in the same house and did not choose a criminal lifestyle; his abusive father left when he was nine years old and after his father left, Douglas was surrounded by positive male role models thereby giving him a second chance; and although he was smart, Douglas chose not to finish school. While Douglas contends that in light of the new mitigation evidence, the State would have been prevented from arguing in its closing that Douglas had all the tools for success but simply chose the path of murder without physical or mental limitations, the record makes clear that Douglas’s characterization of the State's closing is inaccurate.
The State did allege in its memorandum in support of death that "[t]he testimony demonstrated that had [Douglas] wanted to continue his education, he could have. He simply chose not to” and that "the evidence showed that [Douglas] has worked only sporadically throughout his adult life, despite the fact that he has no physical or mental limitations.” However, this memorandum was never presented to the jury.

. Douglas is African-American, and Hob-good was Caucasian.

. During the penalty phase, Douglas’s brother James testified that their father was abusive, both physically and mentally. James relayed the abuse Douglas suffered at the hands of their father, including excessive punishments, multiple spankings, and being hit in the mouth for something he said. Douglas’s mother also explained that Douglas’s father was physically abusive towards her children. She testified that during one such incident, the father struck Douglas so hard that charges were filed against him.

. To support his claims that the one-year time limit violates his rights of effective assistance of postconviction counsel, access to courts, and to petition for writ of habeas corpus, Douglas merely ''reincorporates the argument provided in his Amended 3.851 [motion]." These arguments are insufficiently pled and therefore waived for purposes of appeal. See Ferrell v. State, 29 So.3d 959, 968 n. 6 (Fla.2010) (denying relief on postconviction claims raised on appeal where defendant merely "incorporate[d] the arguments in his postconviction motion by reference”); see also Simmons v. State, 934 So.2d 1100, 1111 n. 12 (Fla.2006) (denying defendant’s claim as waived because "counsel did not properly brief this issue for appeal”).

. Specifically, Douglas claims that the statute fails to prevent the arbitrary imposition of the death penalty because it (1) does not provide a standard for determining that aggravating circumstances outweigh mitigating factors; (2) fails to define "sufficient aggravating circumstances” and fails to define each aggravating circumstance; (3) does not have an independent reweighing of aggravating and mitigating circumstances; (4) provides for aggravating circumstances that have been applied in a vague and inconsistent manner, with juries receiving unconstitutionally vague instructions; and (5) creates a presumption of death once an aggravating factor is found. He also asserts that the statute violates the Florida Constitution by regulating matters of practice and procedure, which are within the province of this Court.

. Douglas raised for the first time in this Court the following claims: (1) the capital sentencing statute creates a presumption of death in felony-murder cases; (2) the Legislature has vested in the Department of Corrections (DOC) the authority to create public records exemptions absent narrowing guidelines, which is an unlawful delegation of power, and failed to state with specificity the public necessity justifying certain exemptions; (3) the Legislature engaged in constitutional interpretation; (4) the sentencing statute is a prohibited "special law"; (5) the statute unlawfully overrules case law regarding a defendant’s knowing and voluntary waiver of fundamental rights; (6) it is a prohibited ex post facto law; and (7) the statute vests in the DOC the authority to determine lethal injection procedures and protocol.

. Douglas also points to the size of these demonstrative aids to support his argument that they were prejudicial. However, neither he nor the record discloses the actual size of these aids.

. At the time of Douglas's trial in 2002, rule 3.400 provided in its entirety:
(a) Discretionary Materials. The court may permit the jury, upon retiring for deliberation, to take to the jury room:
(1) a copy of the charges against the defendant;
(2) forms of verdict approved by the court, after being first submitted to counsel;
*129 (3) in noncapital cases, any instructions given, but if any instruction is taken all the instructions shall be taken;
(4) all things received in evidence other than depositions. If the thing received in evidence is a public record or a private document which, in the opinion of the court, ought not to be taken from the person having it in custody, a copy shall be taken or sent instead of the original.
(b) Mandatory Materials. In capital cases, the court must provide the jury, upon retiring for deliberation, with a written copy of all instructions given to take to the jury room.
Rule 3.400 now requires that in all criminal cases, the jury be provided with a written copy of all instructions given. See In re Amends, to the Fla. Rules of Civil Proc., Fla. Rules of Crim. Proc., 967 So.2d 178, 187 (Fla.2007).

. Douglas contends that the trial court failed to issue a curative instruction explaining to the jury that these items were not in evidence and did not give defense counsel an opportunity to have the mitigating factors "blown up” as a demonstrative aid for the jury to use in its deliberations. This substantive claim is procedurally barred because it could have been raised on direct appeal. See Green, 975 So.2d at 1115 ("Habeas corpus is not to be used for additional appeals of issues that could have been or were raised on appeal. ..."). It is also without merit because trial counsel never made either request and the issue was not preserved for appellate review.