# Supreme Court of Florida

————————

No. SC14-1701

————————

**STATE OF FLORIDA,**
Appellant,

vs.

**RAYMOND BRIGHT,**
Appellee.

[June 16, 2016]

PER CURIAM.

This is an appeal from an order entered on Raymond Bright's initial motion to vacate his convictions of first-degree murder and sentences of death filed pursuant to Florida Rule of Criminal Procedure 3.851. The State of Florida appeals the postconviction court order to the extent that it granted Bright a new penalty phase trial. Bright cross-appealed the postconviction court's order to the extent that it denied his challenges to the convictions. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. As explained below, we affirm the postconviction court's order and remand this case to the circuit court for a new penalty phase proceeding.

## FACTS AND BACKGROUND

### Trial and Direct Appeal

A jury convicted Bright for the first-degree murders of Derrick King and Randall Brown. Bright v. State, 90 So. 3d 249, 254 (Fla. 2012). The jury recommended death by a vote of eight to four for the murders of both victims, and the trial court sentenced Bright to death for both murders. Id. at 256.

On direct appeal, we previously detailed the facts leading to Bright's death sentences:

> On February 18, 2008, Michael Majors went to the home of fifty-four-year-old defendant Raymond Bright in Jacksonville, Florida. Twenty-year-old Derrick King, sixteen-year-old Randall Brown, and Bright were in the house. At approximately 8 p.m., Majors and Brown both left the home.
>
> Brown returned to his mother's home and, after receiving a phone call, borrowed his mother's rental vehicle and left her house between 9 and 9:30 p.m. At approximately 11 p.m., Brown spoke with his mother by phone and advised that he would be home shortly; however, he never returned. At around 8 a.m. the next morning, Majors attempted to call Brown on his cellular phone, but there was no answer. Majors called Brown's mother and was advised that Brown had not returned. Majors then went to Bright's house and, having no response to his knock at the door, Majors climbed into the house through an open window. Upon entering the family room, Majors discovered the bodies of King and Brown.
>
> Derrick King was lying face down on the carpet next to a sofa, partially wrapped in a sleeping bag or comforter. The sofa was saturated with blood on one end, which was adjacent to where King's head rested on the floor. The wall behind the sofa and the ceiling above the sofa evidenced blood. An evidence technician testified during trial that the blood on the ceiling was cast-off blood, [FN. 1] and the pattern was consistent with someone being on the couch and swinging his arm back.

[FN. 1]  Cast-off blood is defined as droplets of blood that are flung from a weapon so as to make a trail of blood where it lands.

Randall Brown was found seated sideways in a recliner with his head leaning up against a wall and a blanket covering his head.  The wall against which Brown's body rested presented a pattern of blood that radiated from his head, and there was also blood on the ceiling.  When crime scene technicians moved the recliner away from the wall, a pool of blood was discovered on the floor.  Above Brown's head was a framed picture with one side of the frame broken away.  That one side was indented, consistent with having been struck by something round, such as a hammer.

Outside the house, the crime scene technicians located a loaded nine-millimeter Smith & Wesson pistol, a loaded assault rifle, and a pair of mechanic's gloves.  During a subsequent search of Bright's yard, technicians recovered a hammer that had been buried.  DNA testing on the hammer revealed two separate DNA profiles, one of which was a major contributor and the other of which was a minor contributor.  During trial, the parties stipulated that the DNA of the major contributor matched the known profile of Derrick King.  Randall Brown could not be excluded as the minor contributor.  The gloves did not test positive for blood.  Further, no latent fingerprints of value were found on the hammer, the nine-millimeter handgun, the assault rifle, or their magazines or ammunition.  No foreign DNA was detected on the fingernail clippings of either victim.

At 7:30 a.m. on the morning of February 19 (the day that the victims were discovered), Bright's ex-wife picked him up at a church near his home.  The ex-wife testified that she and Bright had made plans to secure the admission of Bright to a United States Department of Veterans Affairs [(VA)] clinic for treatment of his cocaine addiction.  She testified that they had agreed to meet at the church because she "was in fear of what was going on" at Bright's house.  During the Spencer hearing, see Spencer v. State, 615 So. 2d 688 (Fla. 1993), the ex-wife testified that she and Bright had previously made multiple calls to law enforcement—including the narcotics division of the Jacksonville Sheriff's Department and Crime Stoppers—to report that Bright wanted certain individuals removed from his house because they had essentially taken over the house for the purpose of

selling drugs. While one officer suggested that Bright accompany the police to the house and identify the persons who were allegedly dealing drugs, Bright and his ex-wife refused to agree to this proposal because they feared retaliation. [FN. 2]

> [FN. 2] Bright's sister, Janice Jones, also testified during the Spencer hearing as to her efforts to remove individuals who were staying in Bright's house. When asked what their names were, she replied Lavelle and Derrick. During the guilt phase, Michael Majors testified that Bright rented a room to an individual named Lavelle Copeland, who was friends with Majors and King. Jones managed to convince Copeland to call her and, when he called, she informed him that she was coming to Jacksonville and would bring the police with her. Copeland responded that he would not leave until Bright paid the money owed to him. When Jones offered to pay the money so that Copeland would leave the house, he responded, "You need to stay out of this. You don't know what you're getting into. It's between me and your brother." Copeland was not at Bright's house on the night of the murders because he was in jail.

After the ex-wife met Bright at the church on the morning of February 19, she called a lawyer and arranged for Bright to speak with homicide detectives the next day. However, at 1:45 a.m. on February 20, law enforcement arrived at the home of the ex-wife and Bright was placed in custody. Subsequent to the arrest, the ex-wife disposed of Bright's bloody clothes because she did not want them in her house.

Bright made statements to separate individuals with regard to what allegedly occurred on the night of the murders. Prior to his arrest, Bright informed friend and former coworker Benjamin Lundy that he had "screwed up" and may have killed two people. Bright told Lundy that the murders occurred after a confrontation erupted when one of the victims accused Bright of stealing drugs. After his arrest, Bright also described the events to Mickey Graham, who was in jail at the same time with Bright on unrelated charges. According to Graham, Lavelle Copeland had moved in with Bright, and he and others were running a crack cocaine operation out of the house. [FN.

3] Bright was afraid of them and felt threatened because they possessed guns. Bright did not want them there and had called the police in an attempt to remove them from the premises.

[FN. 3] On a table in the home, an evidence technician found scales, money, and a "push rod," which is used to pack drugs into a pipe or a bong. However, no drugs were found in the house other than 4.6 grams of marijuana, which was discovered inside Derrick King's sneaker.

Bright told Graham that he went into the kitchen at 2 a.m. on February 19. King was on the sofa and Brown was in the recliner. Brown had a nine-millimeter handgun in his hand and started waving it around. King rose from the sofa and removed the gun from Brown's hand. Bright saw an opportunity and attempted to take the gun away from King. The men struggled and the gun discharged. [FN. 4] The gunshot startled King and caused him to release the handgun. Bright then pointed the gun at King and attempted to shoot him, but the gun misfired. Bright dropped the weapon and attempted to run out of the house, but he tripped and fell. He grabbed a hammer that was within reach, turned around, and commenced striking King, knocking him back toward the sofa where King had previously been lying down. When Bright turned around, he saw that Brown was about to pick up the handgun. Bright then began to strike Brown with the hammer. The next time Bright turned toward the sofa, he saw King reaching for an assault rifle. At that time, Bright again struck King with the hammer. When Bright stopped, he could still hear King and Brown breathing and gurgling, but then the room became silent. Bright described his actions to Graham as having "lost it."

[FN. 4] In the vicinity of King's body was a section of carpet that appeared to be stained with gunshot residue. Testing on the carpet was positive for gunshot residue, and a firearms expert testified that, based upon the location of the residue, a weapon had been fired within six inches of the carpet. From that stain, the evidence technicians traced a bullet trajectory and ultimately discovered a bullet lodged in the wall near the front door of the house. However, neither of the victims'

hands tested positive for gunshot residue. A firearms expert confirmed that the bullet lodged in the wall had been fired from the nine-millimeter handgun that had been discovered in the yard.

The autopsies of King and Brown were conducted by different medical examiners. However, both independently concluded that each victim died from blunt impact trauma to the head. King was struck thirty-eight times about the neck and head, and twenty additional times on his body, for a total of fifty-eight individual injuries. The wounds were consistent with a hammer-type instrument, and injuries were present on the front, back, top, left, and right sides of King's head. Further, the injuries to his body were consistent with defensive wounds. The medical examiner testified that the injuries were consistent with King defending himself against being hit in the head with a hammer and eventually succumbing to the attack. Toxicology results were positive for cocaine and marijuana in King's system.

Brown's skull was fractured in eight to ten separate locations, and he also received fourteen other independent injuries to his body. The injuries to the body, which included a fractured ulna, were consistent with defensive wounds. Based upon the number of injuries to Brown's body, the medical examiner opined that the attack was not brief, but lasted for minutes. Based on the nature of the defensive wounds, the medical examiner concluded that the only injury that would have been fatal on its own, and would have rendered Brown unconscious immediately—a depressed skull fracture—could not have been the first injury inflicted. The medical examiner testified that all of the injuries inflicted upon Brown would have been painful, and they were consistent with a scenario in which Brown was either sitting in a recliner, or fell back onto a recliner, and was repeatedly hit with a hammer as he tried to defend himself. No alcohol or drugs were detected in Brown's system. The jury found Bright guilty of two counts of first-degree murder.

During the penalty phase, the parties stipulated that in 1990, Bright was convicted of armed robbery. A Pensacola police sergeant testified that Bright was arrested for robbing a convenience store while using a knife. During the robbery, Bright leaned over the counter in an attempt to remove money from the register, but he never went behind the counter. The State also introduced victim impact

statements from Randall Brown's mother, aunt, and sister, and Derrick King's grandmother, cousin, and sister.

Bright presented the testimony of his sister, Janice Jones, who stated that Bright and another brother had taken care of her when she was young. Bright had also stepped in and served as the father that her daughter never had. She testified that Bright repaired the roof on her house and saved her $3000 after Hurricane Ivan caused damage. There was an eighteen-month waiting list for roofers when Bright performed the repairs.

Attorney and former [M]arine James Hernandez testified that Bright served nine-plus years in the United States Marine Corps (USMC), during which he served as a fighter jet mechanic. Hernandez described Bright's multiple promotions during his service in the USMC. Hernandez testified that Bright received two separate awards for good conduct, a prerequisite of which is three continuous years of honorable service in the USMC. Hernandez also explained that Bright received a Meritorious Mast Award for noticing a problem on a jet upon take-off which required it to land, thereby preventing a "tragic mishap." Bright received two separate honorable discharges from the USMC, and one general discharge under honorable conditions. The reason for the general discharge was listed as "Alcohol Abuse Rehabilitation Failure."

Bright's girlfriend[, Maxine Singleton,] and two of his former coworkers, Benjamin Lundy and Brian Williams, testified that Bright struggled with drugs and alcohol. The girlfriend stated that when she first met Bright, he was smart, intelligent, hardworking, and clean. However, in November and December of 2007, she noticed that he was continuously fatigued and no longer wanted to do anything. She stated that "[a]fter the drugs took him over he couldn't do nothing, his whole life was just gone." The girlfriend testified that when Bright was away from his house, he wanted to seek assistance and clean up his life. However, she observed that as soon as he returned to the house, "that was it." Brian Williams testified as to one incident where Bright's ex-wife called and asked him to come to her house to check on Bright. When Williams arrived, Bright was intoxicated and upset, and he threatened suicide. Williams contacted the police, who responded and spoke with Bright, but then left. Lundy testified that he suspected Bright was involved in something more serious than alcohol when Bright started to miss work, which was out of character for him. In addition to being coworkers, Williams and Lundy also

considered Bright to be a friend. Lundy stated that when he or anyone else needed help, Bright was always available. Bright helped Williams surprise his children one Christmas by bringing the children the bicycles that Williams had previously hidden.

Lester Baker, who supervised Bright at a mattress manufacturing company during the early 1990s, and Lundy and Williams, who previously worked with Bright at a commercial diesel truck shop, testified that Bright was likable, dedicated, and a hard worker. Lundy and Williams stated that Bright mentored young mechanics and would often volunteer to stay late to complete a project but not charge the shop for the time. They also testified that Bright never appeared to be under the influence of drugs or alcohol while at work.

Finally, Bright presented the testimony of the records custodian of the Jacksonville Sheriff's Office jail, who established that there was no record of any disciplinary reports for Bright.

On September 1, 2009, the jury recommended by a vote of eight to four that Bright be sentenced to death for the murders of Derrick King and Randall Brown.

During the Spencer hearing, in addition to the previously discussed testimony of Bright's sister and his ex-wife, Bright presented the testimony of Dr. Ernest Miller, who diagnosed Bright as suffering from substance abuse along with a dependency problem involving alcohol and cocaine. Miller noted that there was a history of alcohol abuse in the Bright family, which made Bright five to eight times more likely to develop a substance abuse problem. Miller testified that during Bright's various attempts in rehabilitation, his addiction issues were treated, but the underlying emotional issues were not. Therefore, only half of the problem was addressed, and Bright would thereafter go through the "revolving door" of alcoholism. Miller stated that Bright's extensive criminal history—at least twenty-five convictions—appeared to be connected with feeding his drug habit. While Bright asserted to Miller that he acted in self-defense when he killed King and Brown, Miller explained that use of alcohol and cocaine could have caused Bright to be paranoid and led him to believe that the victims intended to harm him even if they did not.

Bright's sister, Janice Jones, testified that their father was a binge drinker who would disappear for several days at a time. She first noticed Bright's drinking problem when he was discharged from

the [M]arines. She believed that he became involved with cocaine after a trip to North Carolina, when an attempt to reconcile with his wife failed. Jones testified that when Bright is sober, he is "amazing," but when he drinks or is on drugs, she does not like him, and he does not like himself.

Attorney James Hernandez, who briefly represented Bright in these proceedings, and attorney Michael Bossen, whom Bright and his ex-wife called the morning after the murders, both testified that Bright was remorseful and cried when he tried to recount the events surrounding the murders. Bossen also related what Bright told him:

> That these people were dealing drugs out of the house. That they paid the rent in drugs, some money but mostly drugs. . . . [Bright] was threatened all day the day before the killings. And then he was—he himself was threatened, that they were threatening to kill him if he didn't basically comply with whatever they were doing. So he basically told me that he tried to get them out and whenever he tried to get them out they threatened him, there were guns. . . . And then basically he said that between 5:00 and 7:00 [a.m.] there was an altercation, he used the hammer to defend himself, the hammer was still in the house. And that he believed that he as a former [M]arine he fought to eliminate that threat.

Finally, a letter from inmate Charles Ferguson was placed in evidence. In the letter, Ferguson stated that Bright had taught him how to read and write, and about God. He also stated that Bright had become a father figure to him.

On November 19, 2008, the trial court sentenced Bright to death for the murders of King and Brown. The court found the same aggravating and mitigating circumstances for each victim. In pronouncing Bright's sentence, the trial court determined that the State had proven beyond a reasonable doubt the existence of the following statutory aggravators: (1) He had previously been convicted of a felony involving the use or threat of violence to the person, § 921.141(5)(b), Fla. Stat. (2008) (the 1990 conviction for robbery) (great weight); (2) He had previously been convicted of a felony involving the use or threat of violence to the person, § 921.141(5)(b), Fla. Stat. (2008) (the contemporaneous murder of the other victim)

(great weight); and (3) the murder was especially heinous, atrocious, or cruel (HAC), § 921.141(5)(h), Fla. Stat. (2008) (great weight).

The trial court found that one statutory mitigating circumstance had been established—the murders were committed while Bright was under the influence of an extreme mental or emotional disturbance, § 921.141(6)(b), Fla. Stat. (2008) (some weight). In support of this mitigating circumstance, the trial court relied on Dr. Miller's testimony that Bright's underlying emotional problems were never treated, and the testimony of Bright's girlfriend and Brian Williams with regard to the changes in Bright's behavior toward the end of 2007, including the threat of suicide.

The trial court also found nineteen nonstatutory mitigating circumstances: (1) a long and well-documented history of drug abuse (some weight); (2) Bright repeatedly sought help for his problems (some weight); (3) remorse (little weight); (4) Bright was afraid of the victims and took steps to remove them from his house (little weight); (5) ten years of service in the USMC with two honorable discharges and a third discharge under honorable circumstances (considerable weight); (6) Bright has skills as a mechanic and served as an aviation mechanic in the USMC (some weight); (7) Bright's actions as a USMC aviation mechanic likely saved lives (some weight); (8) Bright mentored young mechanics (some weight); (9) Bright was a good employee (some weight); (10) Bright was a loving and giving boyfriend (slight weight); (11) Bright is a good brother (some weight); (12) Bright was a good father, and imposition of the death penalty would have a serious, negative impact on others (slight weight); (13) Bright shares love and support with his family (slight weight); (14) Bright was a good friend (slight weight); (15) Bright has been an exceptional inmate (some weight); (16) Bright exhibited good behavior throughout the court proceedings (slight weight); (17) Bright maintained gainful employment (considerable weight); (18) Bright is amenable to rehabilitation and a productive life in prison (slight weight); and (19) Bright has bonded with another inmate and taught him how to read (slight weight). [FN. 5]

> [FN. 5] The trial court found that the following mitigating circumstances were not proven: (1) the capacity of Bright to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; (2) Bright provided

- 10 -

information that assisted with the resolution of the case; and (3) Bright has attempted to have a positive influence on family members despite his incarceration.

The trial court concluded that the established aggravating circumstances substantially outweighed the mitigating circumstances and imposed a sentence of death for each of the murders. However, the sentencing order noted that, had the HAC aggravating circumstance not been present, "this Court may have found a life sentence to be appropriate." When pronouncing the sentencing in open court, the trial court further stated:

And Mr. Bright, I don't mind telling you that I take no delight in imposing the [death] sentence[s] in this case. Quite frankly, but for the heinous and atrocious and cruel aggravator in this case, I would not be imposing [the sentences] that I am going to impose.

Id. at 252-57.

In his direct appeal to this Court, Bright claimed that: (1) the prosecutor improperly commented upon Bright's right to remain silent; (2) the trial court improperly found and weighed as two separate aggravating circumstances his 1990 conviction for robbery and his conviction for the contemporaneous murder of the other victim; (3) the trial court improperly accorded the HAC aggravating circumstance great weight in each of the murders; and (4) Florida's death penalty statute is unconstitutional in light of the decision of the United States Supreme Court in Ring v. Arizona, 536 U.S. 584 (2002). See Bright, 90 So. 3d at 258-62, 64 n.7. We also evaluated the sufficiency of the evidence and the proportionality of Bright's death sentences. Id. at 257, 262. Ultimately, we affirmed Bright's

convictions and sentences.  Id. at 265.  The United States Supreme Court subsequently denied Bright's petition for a writ of certiorari.  Bright v. Florida, 133 S. Ct. 300 (2012).

## Bright's Rule 3.851 Motion

Pursuant to Florida Rule of Criminal Procedure 3.851, on November 6, 2013, Bright filed a timely amended motion to vacate his judgment and sentences. In relevant part, Bright claimed that his counsel were unconstitutionally ineffective during both the guilt and penalty phases of his trial and that he was deprived of a fair trial by the cumulative effect of any errors.  After holding a Huff[1] hearing, the postconviction court granted an evidentiary hearing on the ineffective assistance of counsel claims, during which Bright presented twenty-one witnesses and the State did not present any witnesses.[2]

---

1. Huff v. State, 622 So. 2d 982 (Fla. 1993).

2. Bright presented the expert testimony of Dr. Harry Krop and Dr. Stephen Gold, clinical psychologists; Dr. Robert Ouaou, a neuropsychologist; Dr. Eugene Scheureman, the medical examiner who performed the autopsy on King's body; Dr. Daniel Buffington, a toxicologist; Detective Brookins, the State's crime scene detective from trial; and Janice Johnson and Michael Knox, experts in crime scenes and blood spatter.  With regard to lay witnesses, Bright presented the testimony of Janice Bright Jones, his sister who testified during trial; Michael Bossen, his original attorney; Refik Eler, his second attorney; Richard Kuritz, his ultimate lead counsel; Isidore Knight and Samuel Knight, his childhood neighbors; Brian Williams; Mickey Graham; Detective Cesar Parrales; Tenneka Bright-Lewis, his daughter; Maxine Singleton, his girlfriend who testified during trial; Valerie Kemp; and Charity Kemp.

- 12 -

Although the postconviction court granted Bright's penalty-phase ineffective assistance of counsel claims and his penalty-phase cumulative error claims, it denied Bright's remaining claims. As a result, the postconviction court granted Bright a new penalty phase. The State appealed the postconviction court order to the extent that it granted claims resulting in a new penalty phase and Bright cross-appealed to the extent that it denied certain claims pertaining to the guilt phase of his trial.[3] This review follows.

## ANALYSIS

### State's Appeal

In his amended motion for postconviction relief, Bright claimed that he was deprived of his Sixth Amendment right to effective assistance of counsel during the penalty phase of his trial. Specifically, Bright claimed that his counsel rendered ineffective assistance in failing to investigate and provide sufficient background information, including school and mental hospitalization records, to the mental health expert his counsel retained. He further claimed that his counsel were ineffective in failing to conduct an adequate mental health investigation and

---

3. Bright did not appeal the denial of his claims that: (1) the State violated <u>Brady v. Maryland</u>, 373 U.S. 83 (1963); (2) the State violates the Eighth Amendment through its arbitrary use of discretion in selecting which cases to seek the death penalty for in Duval County; and (3) Florida's death penalty statute violates the Eighth Amendment because it does not require a unanimous jury recommendation of death.

failing to present the results of that investigation to the jury and sentencing court for the purposes of mitigation.

Although the postconviction court heard testimony from several witnesses pertinent to these claims, one of Bright's penalty phase counsel passed away before the evidentiary hearing and consequently was unavailable to testify. Ultimately, the postconviction court agreed with Bright and granted him relief in the form of a new penalty phase. On appeal, the State contends the postconviction court erred. We disagree with the State and affirm the postconviction court's order for the following reasons.

### Strickland Standard of Review

The Sixth Amendment to the United States Constitution provides that "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of Counsel for his defence." Amd. VI, U.S. Const. This right, which was incorporated to the States through the Due Process Clause of the Fourteenth Amendment, includes the right to effective assistance of counsel. See McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970); see generally Gideon v. Wainright, 372 U.S. 335 (1963) (incorporating Sixth Amendment right to assistance of counsel to the States).

However, not all ineffective assistance of counsel is unconstitutional. For this reason, a defendant seeking relief on this basis must establish both that his

- 14 -

penalty phase counsel's performance was deficient and that the deficient performance prejudiced him so as to deprive him of a reliable proceeding.  See Strickland v. Washington, 466 U.S. 668, 687 (1984); Hoskins v. State, 75 So. 3d 250, 254 (Fla. 2011).  Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, reviewing the postconviction court's legal conclusions de novo, but deferring to the postconviction court's factual findings that are supported by competent, substantial evidence.  See Mungin v. State, 79 So. 3d 726, 737 (Fla. 2011); Sochor v. State, 883 So. 2d 766, 771-72 (Fla. 2004).

**Postconviction Evidentiary Hearing**

During the Spencer hearing, Dr. Miller suspected, but had no proof, that Bright's substance abuse and related prior convictions reflected deeper emotional issues and mental health struggles.  The evidence presented in postconviction confirmed Dr. Miller's suspicions for the first time.  Indeed, postconviction evidence revealed that Bright once lamented "I hope not[,] but if I do I know where to come," when asked whether he needed mental health treatment.  The truth is that Bright was quite familiar with mental health problems as he had previously been treated on multiple occasions from 1983 until 1997.

Most notably, records reveal that Bright had at least one incident in which he was involuntarily committed to a mental health institution because he was thought

to be suicidal, a process commonly referred to as being "Baker Acted."[4] According to the Baker Act record, dated June 26, 1997, Bright had exhibited erratic behavior, including destroying furniture, walking in front of cars, and having sleep disturbances. During his involuntary commitment, Bright was diagnosed with depressive disorders, for which he was prescribed antidepressant medication. Furthermore, while the Baker Act record indicated that Bright did not appear suicidal or homicidal during his evaluation, the record nevertheless indicated that Bright should be closely observed for depressed, agitated, and suicidal behavior.

Furthermore, in a 1994 Florida Department of Corrections (DOC) initial psychological screening, Bright reported that he had seen a psychiatrist once every two weeks and that he was diagnosed with depression, anxiety, and bipolar disorder. In connection with those diagnoses, Bright reported to the DOC that he was prescribed Benadryl for three years and had taken stress medication up until 1992. During the DOC screenings, Bright was also observed to be nervous and stuttering. Moreover, Bright reported to the DOC, and his sister corroborated during the postconviction evidentiary hearing, a family history of mental health

---

4. Although there are no corresponding medical records before us, there was evidence to indicate that Bright self-reported that he had been involuntarily committed on one other occasion.

problems—two of his paternal aunts were previously committed to mental health wards for extended periods of time.

Bright's school records were not much better. Contrary to penalty-phase testimony, postconviction records indicated that Bright was a poor student. In terms of quarterly averages, Bright's school records were littered with Fs. Somehow, Bright was able to yield marginally better year-end grades and pass each year, but not without the presence of many Cs and Ds. School records revealed that Bright's teachers expressed concern about him on numerous occasions. An early school record noted that Bright's "attention span is very short." Another record indicated that in seventh grade Bright "was nervous and has a speech impediment. He is very playful." Bright's ninth grade teacher noted that Bright "is very playful and childish. He does not perform as he is capable." In addition, Bright's punctuality and attendance in school were lackluster.

Bright's low academic performance was not the result of low intelligence,[5] but rather the effect of a horrific childhood. Although she had testified during the penalty phase, Janice Bright Jones, Bright's sister, testified once again during the postconviction evidentiary hearing, but this time painting a far more complete

---

5. Bright was of average to high intelligence. He scored a 100 on an IQ test and was thought of as rather intelligent by experts who testified during the evidentiary hearing.

picture of the troubled environment into which she and Bright watched their childhoods vanish.

Bright's childhood home was destitute. It did not have running water, adequate heating, trash collection, or toothpaste. Instead, the children would routinely fill up a bucket with water from the property next door, incinerate their trash, and brush their teeth with baking soda. They bathed themselves in the sink and manually filled the toilet with water.

Furthering the detrimental conditions of Bright's home, it doubled as a junkyard operated by Bright's father. Bright's father would make him and his siblings work long hours at their junkyard, before and after school. Bright began working when he was just five years old. He would toil in the junkyard, stripping cars down to their parts. The demanding nature of the work and his father were unforgiving. For example, Bright was never able to participate in pickup basketball games with other children in the neighborhood or even meaningfully associate with other children. Furthermore, Bright suffered an eye injury while working that has caused him to excessively blink in one eye for the rest of his life. On another occasion, when Bright was in the second grade, a door at school was closed on his hand and his father made him work in the junkyard despite receiving stitches and losing the top of his thumb. To add insult to injury, although Bright's

father told Bright and his siblings that he was setting aside savings for their work, they were never actually compensated.

Instead of accruing savings, Bright only accrued punishments to be dispensed in bulk. Bright was not punished one incident at a time; rather, his father would "add it up" for later. Thus, when Bright's father would actually punish Bright, he would beat him for hours at a time in the bedroom, drawing blood, leaving welts, and rendering him unconscious. He would beat Bright with an electrical cord, his leather belt, or his hand, and say that the beatings were compelled by the Bible.

To make matters worse, Bright was beaten for common childhood behavior, such as wetting the bed or stuttering. Indeed, Bright's stutter tremendously aggravated his father, which would only further a vicious cycle because Bright stuttered more when he was in fear of his father. Moreover, while Bright's father required Bright to work in the junkyard in the mornings and caused Bright to be late for school, he would then beat Bright for tardiness. On another occasion, Bright and his siblings were beaten severely because they forgot to obtain clean water from their neighbor.

Bright's father also instilled fear in the family with his gun. He would say things about killing Bright's mother, which genuinely concerned the children because he kept a loaded gun around the house. Indeed, when he reached his

tipping point, Bright's father would fire the gun around the house. One time, Bright's father reportedly fired a shot in the direction of Bright's older brother who was attempting to run away. Fearing that her father would act on his threats, Bright's sister would take advantage of their father's drunkenness to protect everyone by hiding their father's loaded gun.

Bright's household also featured spousal abuse. Specifically, Bright's sister remembered that their father raped their mother at least twice. She recounted a particular occasion where their father entered the house and instructed the children to wait in the car just before they were supposed to depart as a family for church. Bright's sister recounted hearing her mother crying and screaming in pleas for the father to get off of her. On another occasion, the mother called for help from a neighbor. Moreover, Bright's sister estimated that her father would physically and verbally abuse her mother at least once a month.

Furthermore, instead of protecting Bright, his older brother would only contribute to Bright's nightmarish childhood. Specifically, he would mimic their father and inflict abuse on Bright. Bright's brother reportedly choked Bright to unconsciousness at least twice, and even sexually abused him.

Not only did the evidentiary hearing reveal this abuse, but it also explained for the first time how this abuse affected Bright by causing him severe trauma leading to several mental disorders. Dr. Stephen Gold, a psychologist who

specializes in trauma and analyzing adults who have been abused as children, opined that Bright experienced constant depression and Obsessive Compulsive Disorder (OCD) as early as elementary school, which he correlated with Bright's poor performance in school. Ultimately, Dr. Gold testified that Bright's childhood caused him to suffer from major depression, OCD, social phobia, substance abuse, and severe Post Traumatic Stress Disorder (PTSD).

Dr. Gold defined "trauma" as a life threatening event, an event with potential for serious physical harm, or an event involving sexual violation. According to Dr. Gold, trauma derails development, often adversely impacts concentration and schooling, and creates chronic anxiety. PTSD leads to three major symptoms: (1) unwanted thoughts and nightmares; (2) chronic anxiety; and (3) the tendency to shut down emotionally. Dr. Gold explained that PTSD causes the human reflex for survival in dangerous situations to stay constantly elevated or easily triggered.

In evaluating Bright, Dr. Gold testified to employing the Adverse Childhood Experiences (ACE) study, which identifies ten factors that suggest trauma and adverse environments. The factors indicative of trauma are: (1) childhood physical abuse; (2) childhood verbal abuse; (3) childhood sexual abuse; (4) childhood physical neglect; (5) childhood emotional neglect; and (6) domestic violence in the household. The factors indicative of an adverse environment are: (7) parents who

are separated or divorced; (8) growing up in a household where someone is incarcerated; (9) growing up in a household where there is someone with a serious alcohol or drug problem; and (10) growing up in a household where there is someone with serious mental illness. If a person encounters just one of those factors, then that person is considered significantly more at risk for psychological and mental problems. Furthermore, the more factors applicable, the higher the risk. For instance, an individual who has experienced five ACE factors is predicted to live twenty years less than an individual without any ACE factor.

Bright faced and experienced all ten factors. According to Dr. Gold, the applicability of all ten factors is highly unusual. Indeed, he could not think of another case in his twenty-five years of experience that reflected the severity of Bright's case.

In reaching his conclusions, Dr. Gold testified that he was most concerned by the fact that Bright grew up in a situation that could have easily been referred to as child labor and slave labor. He was also concerned by evidence that Bright was beaten for long periods of time, and left with welts, bleeding, and bruising; that Bright's father constantly put Bright down; and that Bright was not allowed to socialize with other children. Dr. Gold also opined that Bright would stutter when afraid and when confronting an authority figure, and that Bright did not stutter as much in school because he felt safe there. In Dr. Gold's view, Bright constantly

felt on edge as a result of his PTSD. Dr. Gold opined that Bright's substance abuse can be traced to his childhood trauma because it was a way for Bright to feel comfortable and reduce his constantly elevated anxiety. In the end, Dr. Gold lauded the tremendous effort Bright made to establish a solid adaptive life despite his horrific upbringing.

However, this evidence was never presented during Bright's trial. The omission of this evidence can be traced to Bright's now-deceased penalty phase counsel, who retained Dr. Krop to evaluate Bright's competency to stand trial, as well as to potentially conduct more mitigation work. In an August 10, 2008, letter to defense counsel, Dr. Krop advised him in pertinent part that Bright was competent to proceed, but asked whether he should conduct a more comprehensive mitigation evaluation and requested additional background information and records, particularly his VA psychiatric records.

Ten days later, Dr. Krop followed up by providing defense counsel with a detailed history report derived from his discussions with Bright, alerting counsel to a history of family mental health problems, bipolar disorder, as well as a prior involuntary commitment:

> In reviewing his psychiatric history, Mr. Bright reported that he received treatment at the VA for about three years in the early 80s. He was treated primarily for anxiety at the Gulf port [sic] VA Hospital but indicates that he also received a diagnosis of Bipolar Disorder. He has also participated in anger management and substance abuse treatment and has taken Xanax and another medication which he

- 23 -

cannot recall.  He described a familial history of mental illness on his father's side and also indicates that two aunts were hospitalized for psychiatric disorders.  He states that he was Baker Acted in 1996 or 1997 because his wife thought he wanted to commit suicide.  Although he suggests that "the thought has crossed my mind," he insists that he has never been "seriously" suicidal.[6]

Following that letter, defense counsel's case management report indicates that he conducted a further preliminary mitigation investigation into Bright's criminal history, determining that most of his arrests were drug related.  In addition, he indicated that he left in his files a "mitigation manual" and Bright's medical records from a stay at the Biloxi, Mississippi, VA hospital.  Inexplicably, however, the investigation ended there.

---

6.  In addition, the criminal history section of Dr. Krop's report indicated that Bright admitted to being arrested four or five times.  The substance use history section detailed rampant alcohol and drug use from when Bright entered the military at age nineteen until 1999.  Although it appeared that Bright was sober from 1999 to 2007, he began consuming drugs and alcohol after his separation from his wife in 2007 until his arrest for the murders in 2008.

However, the report did not suggest any concerns and even dispelled some potential mitigation leads with regard to the other categories.  For instance, the childhood history section indicated that Bright "was raised in an intact, nuclear home by both natural parents and reported a normal childhood development, free of abuse and trauma . . . .  Mr. Bright was never exposed to domestic violence in his family of origin."  Likewise, the academic history section noted that Bright "graduated on time, with average grades.  He never required specialized course work and was not a disciplinary problem in the academic setting."  In its entirety, the medical history section explained that "Mr. Bright denied any significant medical history.  Specifically, Mr. Bright denied a history of head trauma, seizure activity, syncope, major surgery, and major illness."

On July 23, 2009—nearly one year after his last letter—Dr. Krop sent

defense counsel another letter, once again requesting the same documents:

> I am in receipt of your recent letter wherein you indicated that such workup would be desired, and accordingly, Mr. Bright was seen for an updated interview.
>
> . . . .
>
> Accompanying your cover letter were his records from the VA, which were reviewed by this examiner. Although the defendant previously indicated that he received treatment at the VA for about three years in the early 80s, the records you provided indicate that he was primarily treated for alcohol abuse in 1997 and 1998. He was also assessed as being Agoraphobic with panic attacks. It is possible that his earlier records may have been destroyed.
>
> As noted above, I would be happy to pursue a mitigation evaluation. Accordingly, I would like to review the following documents:
>
> - All depositions and supplemental police reports
> - Military records
> - Records related to prior arrests
> - Medical records
> - Additional psychiatric records (Mr. Bright indicates that he was Baker Acted on two occasions).
>
> I would also like to interview family members and would appreciate your assistance in coordinating these interviews. I would also suggest a neuropsychological screening to determine whether further neurological evaluations are necessary.

On September 16, 2009, Dr. Krop sent defense counsel what appears to be the last

correspondence between them, noting that counsel had not arranged the family

interviews that had been requested.

Indeed, until the postconviction evidentiary hearing, Dr. Krop had never seen Bright's school records, DOC psychological screenings, or Baker Act records. Following his last letter, inexplicably he was not contacted again until postconviction proceedings began. In fact, Dr. Krop testified that he was embarrassed to have found out that Bright had been convicted and sentenced to death through Bright's postconviction counsel.

Dr. Krop testified that Baker Act records would have supported the opinion that Bright is an emotionally unstable individual. Moreover, the family interviews he sought were important because, according to him, forensic clients tend to minimize revealing abuse because they fear losing necessary family support. However, Dr. Krop testified that he would not have felt comfortable testifying with respect to mitigation at the time based on the limited information he had been provided by defense counsel.

Unfortunately, the communication failures were not limited to Dr. Krop, but were a cancer throughout Bright's penalty phase. For instance, Bright's lead counsel was predominantly out of the loop. Indeed, lead defense counsel was hampered, as was Dr. Krop, and counsel scrambled to present the limited evidence of substance abuse presented during the Spencer hearing. The record reveals that on September 30, 2009—after the jury had already recommended that Bright be sentenced to death—lead defense counsel emailed his co-counsel, imploring that

"We still need to put some substance abuse testimony together." Finally, on October 1, 2009, lead defense counsel emailed the State and indicated that the records in co-counsel's file suggested that leads pertaining to Bright's prior stays at the Veterans Affairs hospitals were never pursued:

> I went through his V.A. records yesterday and saw an entry that he has been inpatient there before and in some other program 3 times. Apparently, that information was never obtained so I am trying to track that down.

Even though he was lead defense counsel, the surviving attorney testified that he was unaware that Bright had endured physical abuse and that he had never seen Bright's school records, DOC psychological screenings, or Baker Act records. He also had never seen the correspondence between Dr. Krop and co-counsel, including Dr. Krop's report detailing the mental health history concerns, which he termed "red flags" that amounted to "missed opportunities." Lead counsel further testified that he did not know why Dr. Krop did not testify during either the penalty phase or Spencer hearing, and that he did not recall any discussions with his co-counsel about why Dr. Krop may not have been a good witness. Additionally, he testified that he was not aware of whether a neurospsychology or trauma expert was consulted, but believed such experts would have been important to consult in this case.

Bright's sister's postconviction evidentiary hearing testimony further revealed problems with the mitigation investigation. She explained that she had

- 27 -

neither been informed of nor understood the importance of mitigation in capital cases. According to her, despite the fact that she testified during both the penalty phase and <u>Spencer</u> hearing, Bright's postconviction mitigation specialist was the first person who explained the concept of mitigation to her. Had she known its importance, however, she would have offered more detailed testimony during the penalty phase and <u>Spencer</u> hearing. She further explained that she had only been asked general questions about Bright's schooling and personality—she was never asked anything specific about abuse or their childhood difficulties. Instead, she had been asked to testify only that Bright was a good person who struggled with his drug and alcohol addictions.

When pressed by the State, she also noted that evolving domestic violence and child abuse standards were partially to blame for her decision to not discuss the abuse in response to <u>Spencer</u> hearing questioning concerning their father. She explained that although today she considers such abuse criminal, she did not consider it so at the time of their childhoods. Additionally, she conceded that she testified to the jury about "whoopings," but noted that it was not to a level of detail and that she did not tell the jury that electrical cords were part of the beatings because she did not recognize the importance of the details.

**Deficient Performance**

To establish a Strickland deficiency, the defendant must prove that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." See 466 U.S. at 687. There is a strong presumption, however, that trial counsel's performance was not deficient. Id. at 689. The defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Furthermore, "[j]udicial scrutiny of counsel's performance must be highly deferential." Id. Indeed, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. For instance, we have explained that "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000).

Thus, with regard to the penalty phase, "[t]he failure to investigate and present available mitigating evidence is a relevant concern along with the reasons for not doing so." Rose v. State, 675 So. 2d 567, 571 (Fla. 1996). While counsel's

decision to not present certain mitigation evidence may at times qualify as a tactical decision within his or her discretion, "[i]t is unquestioned that under the prevailing professional norms . . . counsel ha[s] an 'obligation to conduct a thorough investigation of the defendant's background.' " See Porter v. McCollum, 558 U.S. 30, 39 (2009) (quoting Williams v. Taylor, 529 U.S. 362, 396 (2000)); Hannon v. State, 941 So. 2d 1109, 1124 (Fla. 2006). "Among the topics that counsel should consider presenting in mitigation are the defendant's medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." Parker v. State, 3 So. 3d 974, 985 (Fla. 2009) (emphasis added). Consistent with that precept, this Court has found counsel's performance deficient where counsel "never attempted to meaningfully investigate mitigation," although substantial mitigation could have been presented. Asay v. State, 769 So. 2d 974, 985 (Fla. 2000).

As to counsel's duty of securing evidence of mental health mitigation, this Court has recognized that "[w]here available information indicates that the defendant could have mental health problems, 'such an evaluation is fundamental in defending against the death penalty.' " Jones v. State, 998 So. 2d 573, 583 (Fla. 2008) (quoting Arbelaez v. State, 898 So. 2d 25, 34 (Fla. 2005)). In light of its significance, "a reasonable investigation into mental mitigation is part of defense

counsel's obligation where there is any indication that the defendant may have mental deficits." Hurst v. State, 18 So. 3d 975, 1010 (Fla. 2009) (emphasis added). In fulfilling this critical obligation, counsel must not ignore pertinent avenues for investigation of which he should have been aware. See Porter, 558 U.S. at 40.

In a 168-page order, the postconviction court found that Bright's penalty phase counsel performed deficiently on multiple grounds. With regard to counsel's cooperation with Dr. Krop, the postconviction court found that the failure to follow up with and present Dr. Krop could not have been a strategic decision. Furthermore, the postconviction court found that an unfavorable opinion by Dr. Krop could not have explained the failure to present Dr. Krop because he was never afforded the opportunity to render an informed opinion. Similarly, the postconviction court found that the failure to collect or present Bright's school records, DOC psychological screenings, and Baker Act records could not have been a strategic decision. With regard to the testimony of Janice Bright Jones and Dr. Gold, the postconviction court found that the omission of their testimony could not have been a strategic decision because lead defense counsel testified that he was not aware of the abuse Bright suffered. Likewise, the postconviction court found that all the evidence discovered by Bright's postconviction mitigation specialist demonstrated that his penalty-phase counsel performed deficiently in failing to hire a mitigation specialist.

The State contends that the postconviction court erred because it did not accord Bright's now-deceased counsel the presumption of reasonable trial strategy and instead relied on the fact that it did not have the benefit of his testimony. The State maintains that Bright's counsel purposely, following their investigation, made a strategic decision to present a "good guy" mitigation case rather than a mental health mitigation case. We disagree.

In support of its contention that the postconviction court failed to accord Bright's deceased penalty phase counsel the presumption of reasonable trial strategy, the State refers this Court to Gore v. State, 964 So. 2d 1257 (Fla. 2007), and Callahan v. Campbell, 427 F.3d 897 (11th Cir. 2005). While both of those cases also involved a trial counsel who was unavailable during the evidentiary hearing to testify as to strategy, the similarities with Bright's case end there.

In Gore, the lead counsel was not presented as a witness during the evidentiary hearing and, thus, only his co-counsel was available to testify as to strategy. See 964 So. 2d at 1269. Noting that the alleged deficiencies in Gore were plausibly within the realm of reasonable trial strategy, we held that the lack of testimony compelled us to hold that Gore had not overcome the presumption of reasonable trial strategy. See id. For example, with regard to allegations that Gore's counsel performed deficiently in failing to present evidence of neurological disorders, we noted that Gore's trial counsel presented two mental health experts

during the penalty phase and asked his family about medical history, and that there was no medical evidence in the record that Gore had a neurological disorder. See id. Moreover, even if Gore did have a neurological disorder, the evidence was "extremely tenuous, at best," particularly where the family members expressed doubt about the theory and the postconviction experts confirmed the tenuous nature of the alleged evidence. Id. at 1274. In light of the lack of supporting evidence, which would have also placed Gore's counsel on notice had it existed, we determined that it was within the range of sound trial strategy for Gore's counsel not to pursue the theory. See id.

Likewise, in Callahan, one of the penalty-phase counsel passed away before the postconviction evidentiary hearing and, as a result, the United States Court of Appeals for the Eleventh Circuit relied on the record and presumed that counsel had reviewed the relevant documents, questioned Callahan's family and friends about mitigation, and had a discussion with Callahan about what mitigation to present during the penalty phase. See 427 F.3d at 932-36. As the Eleventh Circuit noted, the burden was on Callahan to prove that his deceased counsel did not take those steps. See id. at 933. However, the record demonstrated that Callahan's counsel had conducted significant mitigation investigations. See id. For instance, his counsel knew that he had been evaluated by six psychiatrists, two psychologists, and a psychiatric social worker—none of whom reported any mental

health problems. See id. at 933-34. In addition, Callahan's counsel had ample psychiatric and medical records from Callahan's childhood, none of which mentioned abuse, and there were no other indications of problems. See id. at 934-36. The Eleventh Circuit concluded that Callahan failed to overcome the presumption of reasonable strategy, given the lack of unpursued mitigation leads in the record. See id.

Thus, this case is distinguishable from Callahan and Gore because the record before us demonstrates affirmative evidence that the now-deceased attorney who was unavailable to testify was placed on notice as to mitigation leads but did not pursue them. Specifically, Dr. Krop's letters placed him on notice that Bright had a history of mental health problems, and yet counsel failed to follow up and uncover the information necessary to make a reasonable and informed decision. Moreover, the now-deceased attorney failed to obtain Bright's school records, a basic first step that would have yielded more leads. Given the notice that he received, as the postconviction court found, the failure to follow up could not have been a tactical decision. Gore and Callahan lacked the affirmative evidence of unpursued leads known to counsel that are glaring in this case. Unlike in Callahan, Bright has satisfied his burden of proving that counsel responsible for the penalty phase did not take the steps that reasonable trial counsel should have taken.

Rather, this case is strikingly similar to Douglas v. State, 141 So. 3d 107 (Fla. 2012), in which trial counsel had no independent recollection as to whether omissions were attributable to strategy, and we found deficiency under very similar facts:

> The record establishes that almost two years before the commencement of Douglas's guilt-phase proceeding, trial counsel contacted Dr. Krop, a licensed psychologist, to aid in addressing Douglas's mental state at the time of the offense and to uncover possible mitigating factors. In May 2000, Dr. Krop conducted a clinical interview with Douglas, during which he administered a battery of psychological tests. Following this evaluation, Dr. Krop issued a June 2000 report to trial counsel indicating that Douglas was competent to proceed and requesting from counsel the opportunity to review depositions, school records, police reports, prior presentence investigation reports, and any other relevant materials that might pertain to possible mitigation. The report further requested that trial counsel schedule a follow-up evaluation so that Dr. Krop could discuss the crime with Douglas and coordinate interviews with relevant family members. According to Dr. Krop's files, he never received any of these materials from trial counsel. Dr. Krop also did not have an independent recollection of discussing this report with trial counsel over the phone, and such a discussion was never recorded in Dr. Krop's notes.

> . . . .

> The testimony of Douglas's penalty-phase witnesses demonstrates counsel must have known, at the very least, that Douglas had difficulty reading, was placed in a special academic program, dropped out of school in the seventh grade due to a learning disability, and had a father who was physically and emotionally abusive. Despite having access to this information, there is no evidence that counsel sought to further investigate Douglas's mental health either by seeking background records or by consulting with a mental health expert. In fact, even after Dr. Krop's request for additional materials, the record does not disclose that counsel made any effort to provide

- 35 -

Dr. Krop with readily available evidence. Certainly, counsel should not have considered Dr. Krop's competency evaluation as "a reliable substitute for a thorough mitigation evaluation." Ponticelli v. State, 941 So. 2d 1073, 1096 n.24 (Fla. 2006) (quoting Arbelaez, 898 So. 2d at 34); id. at 1095-96 (noting that counsel should not have considered a mental health expert's fifteen-minute competency evaluation conducted prior to trial as a reliable substitute for a thorough mitigation evaluation). We conclude that there were sufficient facts in this case to place counsel on notice that further investigation of mental health mitigation was necessary. Consequently, counsel's failure to investigate this line of defense was not reasonable under prevailing professional norms.

Id. at 117-118, 121.

With regard to deficiency, the conduct in this case is nearly indistinguishable from Douglas and arguably more alarming. Bright's trial counsel were given at least the same or stronger notice of mental health concerns by Dr. Krop. Indeed, Dr. Krop told counsel multiple times that Bright indicated he had been involuntarily committed. Despite this notice, just like in Douglas, counsel failed to follow up with Dr. Krop's requests. Moreover, the failure to follow up cannot be explained by concerns about harmful evidence because, unlike in Douglas, Bright has not been diagnosed with any antisocial or psychopathic traits. See id. at 123-24. Plainly, defense counsel's utter failure to follow up was not reasonable under prevailing norms of professional conduct.

The fact that some preliminary family interviews indicated that Bright's history was normal did not render a meaningful investigation dispensable. The unhelpful answers of Bright's family members were partly the fault of Bright's

counsel. The postconviction court expressly found that Bright's family members were not properly questioned about or instructed on the purpose of mitigation. Specifically, the postconviction court found that Bright's witnesses were asked, even during the investigative stage, to only discuss Bright's good qualities.

Rompilla v. Beard, 545 U.S. 374 (2005), provides us guidance where family interviews might suggest there is no mitigation, but available records suggest otherwise. There, the United States Supreme Court held that:

> even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial.

Id. at 377. Undoubtedly, the same principle applies when family members and the defendant suggest that there is no mitigation available, but the competency evaluation process alerts counsel to extensive and multiple mental health concerns, including an involuntary commitment.

In sum, we conclude that competent, substantial evidence supports the postconviction court's findings that Bright's trial counsel performed deficiently during the penalty phase because no strategic decisions could have supported the investigative failures in this case. See Wiggins v. Smith, 539 U.S. 510, 522 (2003) ("[C]ounsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision . . . because counsel had not

'fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background.' " (quoting Williams, 529 U.S. at 396)).

**Prejudice**

With regard to Strickland prejudice, we must determine whether the deficient performance of counsel during the penalty phase undermines this Court's confidence in the sentence of death and the reliability of the penalty phase proceedings. See Hurst, 18 So. 3d at 1013. We make this determination by viewing the sentence of death in the context of the penalty phase evidence, the mitigating and aggravating circumstances found, and the previously undiscovered postconviction evidence. See id. This standard does not "require a defendant to show 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.' " Porter, 558 U.S. at 44 (quoting Strickland, 466 U.S. at 693-94). "To assess that probability, [the Court] consider[s] 'the totality of the available mitigation evidence' and 'reweig[hs] it against the evidence in aggravation.' " Id. at 41 (quoting Williams, 529 U.S. at 397-98).

After considering the evidence revealed during the postconviction evidentiary hearing, the postconviction court found that Bright was prejudiced because the jury did not hear any evidence of Bright's abusive childhood or mental

health problems, or any evidence of how that troubled history shaped Bright. Furthermore, had that evidence been presented during the penalty phase or Spencer hearing, the postconviction court found that the trial court may have found the statutory mitigating circumstance of lack of capacity to conform conduct to the law. Thus, the postconviction court found that the deficient performance of Bright's counsel undermined reliability in the outcome of Bright's penalty phase.

The State, however, theorizes that Bright was not prejudiced because the evidence that was not presented during the penalty phase would have been inconsistent with the "good guy" portrayal of Bright. Furthermore, the State asserts that the evidence was not sufficiently strong to overcome the evidence presented in aggravation. We disagree.

In Bright's case, the previously undiscovered evidence is considerable in contrast with the mitigation that was actually presented during the penalty phase and Spencer hearing. Indeed, the undiscovered "mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [Bright's] moral culpability." See Wiggins, 539 U.S. at 538; see also Penry v. Lynaugh, 492 U.S. 302, 319 (1989) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable."). The incomplete picture the jury was presented during trial here

- 39 -

notably omitted Bright's history of child labor, rampant and violent beatings, educational difficulties, social isolation, poor hygiene, sexual abuse, and mental health problems, including at least one confirmed involuntary commitment.

With regard to reweighing the aggravating and mitigating circumstances, the postconviction court appropriately referred to Simmons v. State, 105 So. 3d 475 (Fla. 2012), for the proposition that a finding of HAC will not preclude a new penalty phase when there is substantial new mitigation. Id. at 509. In Simmons, this Court reversed the postconviction court's denial of relief where the jury found three aggravating circumstances in an interrogatory verdict, including HAC; the defendant and his family were not told of the importance of mitigation; and no mental health mitigation was presented during the penalty phase. See id. Here, Bright's penalty phase counsel similarly failed to impress upon him or his family the importance of mitigation and failed to present any mental health mitigation. In addition, even without the substantial mental health and childhood evidence that emerged in postconviction, the trial court that sentenced Bright to death expressed notable hesitation in imposing the ultimate punishment. Indeed, the trial court expressly stated that, but for the HAC aggravator, it may have sentenced Bright to life. Thus, we think the new evidence, including support for an additional statutory mitigating circumstance, undermines the reliability of Bright's penalty phase and ensuing sentences of death.

While it is true that in Douglas we did not consider Douglas sufficiently prejudiced by similar deficiencies of counsel, the evidence in Douglas carried a serious risk of being more harmful than helpful to Douglas' case. Specifically, two experts testified that Douglas exhibited antisocial personality traits, that he was a dangerous man, and that he was susceptible to being enraged when his sexual advances were rejected. See Douglas, 141 So. 3d at 123-24. In addition, the expert testimony would have opened the door to his criminal history, including a rape charge that had been dropped, two domestic violence convictions, a drive-by shooting charge that had been dropped, and drug charges. Id. at 124. Douglas also risked disclosure of "his history of violence, including an incident where he pulled a gun on the mother of one of his children because she had 'nagged him.' " Id. Thus, in Douglas, where counsel testified to pursuing a good person strategy, we concluded that the record supported the finding that the previously undisclosed evidence would have been more harmful than helpful. See id.

Unlike in Douglas, Bright's previously undiscovered mitigation carries little risk of new harmful evidence. To the extent that Bright had a criminal or violent past, that information was already presented during the penalty phase or Spencer hearing. For instance, the penalty phase jury was read a stipulation regarding Bright's armed robbery conviction in 1990, but it heard testimony that Bright did not actually use the weapon during the robbery. In addition, during the Spencer

- 41 -

hearing, the trial court heard about one report of domestic violence where Bright was not alleged to have hit his ex-wife, but only grabbed a phone off the wall and broke a door. The trial court also heard that Bright had approximately twenty-two convictions for making or altering a forged instrument, a DUI, several hit and run accidents, and a burglary. Dr. Miller opined, however, that those convictions were all related to Bright's drug habit. This evidence, which was already disclosed during trial, is a far cry from Douglas' far more violent history that would have emerged for the first time. See id. Moreover, unlike Douglas, Bright has not been diagnosed with any antisocial personality disorder traits or psychopathic traits. Therefore, there is no risk of harmful information emerging from the presentation of Bright's full mitigation.

Douglas is also distinguishable simply because Bright has suffered far more prejudice than Douglas. In Douglas, we expressly agreed with the postconviction court's finding that the mental health mitigation would have been entitled to little weight, given that the expert testimony was not compelling. See id. In addition, the evidence in Douglas' school records and his history of abuse would have been cumulative to testimony presented during the penalty phase. See id. at 125. We also determined that, to the extent evidence was noncumulative, the omission of evidence in Douglas was less prejudicial than the sufficiently prejudicial omission of evidence in Rompilla, 545 U.S. 374; Porter, 558 U.S. 30; and Wiggins, 539 U.S.

510; cases in which the evidence included far more compelling mitigation. See Douglas, 141 So. 3d at 124-26.

Here, the testimony was not cumulative to the evidence presented during the penalty phase and was compelling mitigation. For example, the evidence from Bright's school records, showing that Bright failed many of his classes and underperformed in school, was not cumulative to any testimony during the penalty phase. Furthermore, while Bright did present the testimony of Dr. Miller during the Spencer hearing, his testimony was limited to a simple unexplained diagnosis of substance abuse. Far beyond unexplained substance abuse, the mental health evidence that emerged during postconviction shows that Bright was involuntarily committed, has a notable history of mental health problems in his family, and suffers from severe PTSD—including all ten ACE factors.

This noncumulative mitigation is the very type of mitigation presented in Rompilla and Porter that this Court reasoned was lacking in Douglas. See Douglas, 141 So. 3d at 124-26 (distinguishing Rompilla, 545 U.S. at 390-93, and Porter, 558 U.S. 30). For example, while Bright did not fight in two horrific battles during his service in the Marine Corps or have brain abnormalities, c.f. Porter, 558 U.S. at 454, he did suffer horrific child abuse and evidenced poor performance in school, as did Porter. See id. In addition, while Bright did not

have the identical mental health problems that Rompilla suffered,[7] he and Rompilla share other adverse conditions including: (1) a history of mental problems; (2) severe and frequent beatings; (3) a childhood in which he was not allowed to generally associate with other children; (4) a childhood home without running water; and (5) having been sent to school with horrific hygiene and clothing. See Rompilla, 545 U.S. at 390-93.

This case presents the same deficient performance found in Douglas, but with sufficiently more prejudice. The jury never learned who Raymond Bright is. Therefore, competent, substantial evidence supports the findings of the postconviction court that Bright was prejudiced by the deficient performance of his penalty phase counsel. We thus affirm the trial court's order granting Bright a new penalty phase.[8]

---

7. Rompilla manifested signs of schizophrenia and fetal alcohol syndrome. See Rompilla, 545 U.S. at 390-93.

8. Although we ordered that Bright and the State submit supplemental briefing in light of Hurst v. Florida, 136 S. Ct. 616 (2016), a request which both parties ably answered, we need not address the applicability of Hurst to Bright's case in light of our holding today.

## Bright's Cross-Appeal

## 1. Ineffective Assistance of Counsel During the Guilt Phase

In his cross-appeal, Bright contends that the postconviction court erred in finding that his trial counsel were not unconstitutionally ineffective during the guilt phase of his trial. Bright claims that they were ineffective for failing to adequately investigate and present his self-defense claim, for failing to present evidence of the victims' reputations, and for failing to challenge an allegedly biased juror for cause that ultimately served on the jury.[9] We disagree with all of Bright's claims.

<u>Failure to Adequately Investigate and Present Self-Defense</u>

Bright contends that his trial counsel were unconstitutionally ineffective in failing to adequately present his self-defense claim. In general terms, he claims that his attorneys were ineffective because they did not consult with or present any expert witnesses to support his self-defense claim and that they should have presented more lay witnesses. The postconviction court, however, determined that Bright suffered neither deficiency nor prejudice with regard to either contention.

---

9. Bright does not appeal the postconviction court's denial of his additional claims that his counsel were unconstitutionally ineffective for: (1) failing to object to prosecutorial misconduct; (2) misadvising Bright to refrain from testifying; and (3) failing to request or object to the omission of a presumption of fear jury instruction.

Because the postconviction court's findings are supported by competent, substantial evidence, we affirm.

In the postconviction context, evidence presented during an evidentiary hearing is cumulative where the same evidence was previously elicited during trial through cross-examination. See Ponticelli, 941 So. 2d at 1085. Furthermore, postconviction evidence can be cumulative to evidence presented during trial even where the postconviction evidence is more elaborate than the trial testimony. See Sweet v. State, 810 So. 2d 854, 863 (Fla. 2002).

We have held that a failure to present cumulative evidence does not establish unconstitutional ineffective assistance of counsel because its omission neither constitutes deficient performance nor results in sufficient prejudice. See Beasley v. State, 18 So. 3d 473, 484 (Fla. 2009) (citing Darling v. State, 966 So. 2d 366, 378 (Fla. 2007)) (not deficient); Sochor, 883 So. 2d at 784 (Fla. 2004) (insufficiently prejudicial). In fact, the opposite can be true. As we have observed, "more [evidence] is not necessarily better." Woods v. State, 531 So. 2d 79, 82 (Fla. 1988).

Reflecting this principle, we have specifically recognized that the decision to rely on evidence elicited through cross-examination of the State's witnesses, in lieu of calling additional witnesses, can be sound trial strategy. See Johnston v. State, 63 So. 3d 730, 741 (Fla. 2011); Occhicone, 768 So. 2d at 1048. The mere fact that

a defendant's postconviction counsel later disagrees with the strategy makes no difference.  See Occhicone, 768 So. 2d at 1048.

**Expert Witnesses**

Bright contends that his trial counsel was deficient for failing to consult with or present experts in crime scene reconstruction, blood spatter, toxicology, forensic pathology, and gunshot residue and ballistics.[10]  As a result, Bright contends that he was prejudiced because the jury did not hear evidence that a struggle occurred between him and the victims.  He specifically contends that these witnesses would have shown that (1) a struggle with significant movement occurred throughout the house; (2) Brown and King were awake when Bright first struck them; (3) King, in particular, was awake due to recent cocaine ingestion; and (4) the gunshot occurred before the events in question.  According to Bright, the jury's inability to hear this evidence resulted in a trial for which confidence in the outcome was undermined.  We disagree.

Bright overlooks the evidence that was presented during trial.  Despite Bright's claims to the contrary, the jury did hear evidence that a struggle occurred, the gunshot was fired before the events in question, and the victims were awake.

---

10. In addition, Bright raised but waived claims with regard to a DNA expert and latent print expert because he failed to present any such experts during the evidentiary hearing.  See Ferrell v. State, 918 So. 2d 163, 174 (Fla. 2005).

Thus, we conclude that Bright has not established ineffective assistance of counsel because competent, substantial evidence supports the postconviction court's determination that the evidence elicited during the postconviction evidentiary hearing would have been cumulative to evidence presented during his trial.

With regard to postconviction evidence of a struggle, such evidence was cumulative to the evidence elicited from multiple witnesses during trial, as well as to the various pictures of the crime scene admitted into evidence. Specifically, Lundy and Graham each detailed similar recollections of Bright's account of the events. Bright, according to both Lundy and Graham, indicated that both victims were awake, there was a struggle over a gun, the victims were fighting Bright at the point in time which Bright began swinging a hammer, and there was significant movement throughout the living room. The medical examiner who performed the autopsy on Brown also testified that a struggle occurred.

In addition, other evidence presented during trial was consistent with a struggle. For instance, the pictures of the crime scene show blood everywhere and a room in disarray, consistent with the possibility of a struggle. Defense counsel highlighted the photographs' consistency with a struggle during his closing remarks to the jury. Moreover, counsel secured several concessions from the State's expert witnesses that were consistent with a struggle occurring in the manner recounted by Bright to Graham and Lundy. For example, the State's

firearm expert conceded that a struggle over the gun, as recounted by Bright, to Lundy and Graham could account for a gun to misfire in the manner Bright alleged[11] and that the gunshot discovered in the house could only have been fired from within six inches of the floor. The State's crime scene expert, Detective Brookins, conceded that blood was everywhere in the room, ultimately leading her to conclude that she could not rule out a struggle throughout the room. Furthermore, the medical examiner conceded that the defensive wounds of the victims and the abrasions to Bright could indicate a struggle.

Similarly, despite Bright's claim to the contrary, the jury did hear evidence that King and Brown were awake. As discussed above, Graham and Lundy both testified to Bright's account that King and Brown were awake, threatened him with a gun, and attacked him. Moreover, Bright failed to demonstrate any substantial evidence during the postconviction evidentiary hearing that either King or Brown was awake.[12]

---

11. The expert's testimony during direct examination, however, indicated that there was no evidence that a misfire occurred and that the gun recovered from the crime scene was in working condition.

12. With regard to King, Bright's postconviction toxicology expert could only testify that King had ingested cocaine within two to four hours of his death. In contrast, the trial testimony of the medical examiner was that King had ingested cocaine within "minutes to hours." With regard to Brown, Bright failed to present any evidence during the evidentiary hearing that Brown was awake. Consistent

With regard to evidence that the gunshot was fired earlier in the day of the events in question, Bright failed to establish that evidence during the evidentiary hearing and could only produce cumulative evidence. During trial, Murphy and Lundy both testified as to Bright's account that the gunshot occurred during the struggle. Moreover, the State's firearms expert did not testify as to when the gunshot residue was deposited. Consistent with the lack of expert testimony concerning the time the gunshot residue was deposited, during the postconviction evidentiary hearing, Bright's crime scene reconstruction experts testified that there is no technology currently available that could indicate the time that gunshot residue was deposited. The strongest postconviction evidence was that gunshot residue is transient in nature and, therefore, not likely to last long in a house with normal activity. Thus, the postconviction evidence did not prove precisely when the gun was fired and was, at most, merely cumulative to the testimony presented during trial.

We thus conclude that with regard to the lack of defense expert witnesses, Bright has failed to show that he has suffered Strickland prejudice.[13] Through

---

with that, Brown's autopsy suggested that Brown had not recently consumed any drugs.

13. Bright also contends that the failure to consult experts discussed above, particularly in crime scene reconstruction and blood spatter analysis, resulted in inadequate preparation for the impeachment of Detective Brookins. However, as

cross-examination of various State witnesses, the jury did hear in some form the evidence that Bright now claims was never presented. Therefore, this claim fails. See Whitfield v. State, 923 So. 2d 375, 384 (Fla. 2005) ("[B]ecause the Strickland standard requires establishment of both [the deficient performance and prejudice] prongs, when a defendant fails to make a showing as to one prong, it is not necessary to delve into whether he has made a showing as to the other prong.").[14]

discussed above, we conclude that competent, substantial evidence supports the postconviction court's determinations that the cross-examination was adequate.

14. We also conclude that counsel made a reasonable strategic decision to rely on cross-examination of the State's witnesses in lieu of presenting expert witnesses. He testified during the postconviction evidentiary hearing that in the past he has refrained from hiring expert witnesses where the jury may not like the expert, the jury may find the expert lacks credibility, there was a risk the State would use the expert to its advantage, or points of evidence were obvious to a layperson, thereby rendering an expert witness unnecessary.

In this case, counsel believed that the photographs of the crime scene, which depicted blood "everywhere," were self-explanatory and rendered hiring expert witnesses unnecessary to demonstrate self-defense. Thus, counsel testified that he purposely chose to rely on the State's witnesses and the power of cross-examination. Indeed, during guilt-phase closing remarks, he openly told the jury that this was his strategy: "But you understand there's only so many witnesses in a case, and if the State calls the witnesses in the case that I need, then I can get the evidence through them. And that's what happened in this case. The State called the witnesses that I needed." (Emphasis added.) As discussed above, the record demonstrates that counsel successfully cross-examined the State's witnesses to secure the evidence Bright now claims was lacking. Therefore, counsel's choice was not deficient.

- 51 -

**Lay Witnesses**

Bright also contends that his counsel were ineffective for failing to call or elicit further testimony from several lay witnesses. Specifically, Bright contends that his counsel were deficient for not calling Valerie Kemp, Charity Kemp, Maxine Singleton, Tennaka Bright Lewis, or Bridget Bright as guilt phase witnesses and for failing to adequately question Janice Bright Jones.[15] He claims that these failures prejudiced him because the jury did not hear evidence that: (1) the house was not usually in the condition depicted in the crime scene photographs; (2) Brown and King had taken over the house; (3) Brown had called Charity Kemp moments prior to the events in question to say that he intended to confront Bright

---

15. Bright also generally avers that his counsel were deficient for failing to present or more extensively question: (1) Lavelle Copeland; (2) Sergeant Kreeger; (3) Joseph Lundy; (4) Michael Bossen; and (5) Brian Williams. However, Bright waived his claims with regard to Copeland and Sergeant Kreeger due to insufficient briefing by omitting any discussion of them, as well as to Lundy due to his failure to present Lundy during the evidentiary hearing. See, e.g., Ferrell, 918 So. 2d at 174 (failure to present witness during evidentiary hearing constitutes waiver); City of Miami v. Steckloff, 111 So. 2d 446, 447 (Fla. 1959) (insufficient briefing constitutes waiver).

With regard to Bossen and Williams, the postconviction court refused to accept their testimony because they were not included in any amended motion, and Bright did not make a showing of good cause as required by rule 3.851. Bright challenges this refusal on appeal. This Court reviews the refusal to grant a party leave to amend a 3.851 motion under an abuse of discretion standard. See Doorbal v. State, 983 So. 2d 464, 484 (Fla. 2008). We conclude that the postconviction court did not abuse its discretion. See id. (finding no abuse of discretion where a postconviction court denied amendment to a claim that was not timely filed).

about drugs Bright had allegedly stolen; (4) Brown and King had reputations for violence in the community; and (5) Bright feared for his life. However, competent, substantial evidence supports the postconviction court's findings that Bright has established neither deficient performance nor prejudice.

With regard to evidence that the house was not in the same condition as depicted in the photographs, such evidence was merely cumulative to the evidence of a struggle as discussed above. Moreover, Bright has not presented any credible witnesses that could testify to this point. The postconviction court determined that neither Valerie Kemp nor Charity Kemp, the only witnesses Bright presented on this point, had any credibility. Because the postconviction court has the superior vantage point to assess the credibility of witnesses and judge their credibility, we will not second guess the postconviction court's credibility determination by substituting our judgment on the credibility of witnesses and the weight to be given to the evidence where the postconviction court's determination is supported by competent, substantial evidence. See Foster v. State, 929 So. 2d 524, 537 (Fla. 2006). Here, the postconviction court's credibility determination is owed deference because the postconviction court noted that both women exhibited questionable demeanors and testified to rampant drug use—including when they were at Bright's home, as well as to multiple prior convictions for crimes involving dishonesty. Thus, according the deference owed to the postconviction court on

determinations of credibility, we conclude that competent, substantial evidence supports the postconviction court's conclusion that Bright has not sufficiently demonstrated prejudice from the omission of their testimony.

With regard to evidence that Brown and King had taken over Bright's house, the evidence would merely have been cumulative to the testimony of Graham. The jury heard Graham concede that, as far as he knew, Brown and King did not have a living arrangement with Bright, but rather that the victims had imposed themselves over Bright's efforts to remove them, which included calling the police.

With regard to Charity Kemp's account that Brown called her and told her he was planning to confront Bright moments prior to the events in question, this evidence would merely have been cumulative to the testimony of Graham and Lundy. Both testified to Bright's account that he was confronted by Brown and King over drugs. Moreover, as noted, the postconviction court found that Charity Kemp lacked credibility.

Although no evidence of the victims' reputation for violence was presented during trial, Bright nevertheless cannot establish prejudice. We have held that a defendant is not prejudiced by the omission of evidence that would have been inadmissible during trial. See Simmons, 105 So. 3d at 495. Evidentiary rulings on the admissibility of evidence are reviewed for abuse of discretion. See Evans v. State, 177 So. 3d 1219, 1229 (Fla. 2015). We apply the same standard when

reviewing postconviction claims of prejudice arising from trial counsel's failure to present or challenge evidence. See Arbelaez, 898 So. 2d at 44.

Bright has not established prejudice because the trial court would not have abused its discretion in excluding the Kemps' testimony with regard to the reputations of the victims. We have held that a court does not abuse its discretion when it excludes reputation evidence that is based only on the opinions of a very limited community segment. See Larzelere v. State, 676 So. 2d 394, 399-400 (Fla. 1996) (finding no abuse of discretion in exclusion of testimony of two witnesses who knew of a person's reputation from a "small number of individuals"). Here, both women testified that only one to four people told them of the victims' reputations. Moreover, their testimony was inconsistent because they also testified that "numerous" people or one hundred people told them this, none of whom they could identify. Thus, even if the postconviction court had found the Kemps credible (which it did not), their testimony concerning the reputations of the victims would have been inadmissible because it was derived from an insufficiently broad community. See id.

In sum, Bright has not been able to establish that any of the lay witnesses would have testified to any noncumulative evidence or that the evidence of the victims' reputations would have been admissible. Therefore, he has not established prejudice with regard to the lay witnesses he alleges should have been

presented.  Thus, we need not address deficiency and this claim fails.  See

Whitfield, 923 So. 2d at 384.

### Failure to Challenge an Allegedly Biased Juror for Cause

Bright contends that his counsel were unconstitutionally ineffective in

failing to challenge a juror for cause who was allegedly biased.  Bright alleges that

the juror was biased because she stated during voir dire that she would think "a

tiny bit" that Bright was hiding something if he did not take the stand.  We

disagree.

First, Bright has failed to establish deficient performance.  Competent,

substantial evidence supports the postconviction court's findings that Bright's

counsel reasonably and purposefully left the juror in question on the jury.  Indeed,

defense counsel testified that he would have used one of his six remaining

peremptory challenges had he perceived a problem.  While he could not recall his

reason for not moving to strike the juror, counsel opined that he probably thought

the juror was a favorable juror because her answers to voir dire questioning

indicated that she was "middle of the road" with regard to the death penalty.

During cross-examination, counsel reiterated that generally he takes the totality of

a juror's responses into account, particularly his or her predispositions concerning

the death penalty, as well as a juror's demeanor.  Thus, competent, substantial

evidence supports the postconviction court's findings that defense counsel made a strategic decision.

Moreover, Bright has not proven prejudice. In the postconviction context, we have held that a defendant must prove that an <u>actually biased</u> juror sat on the jury in order to succeed on a claim of ineffective assistance of counsel for failing to make a cause challenge. <u>See</u> <u>Carratelli v. State</u>, 961 So. 2d 312, 324 (Fla. 2007). This is a higher standard than on direct appeal—mere doubt about a juror's impartiality is insufficient under this standard. <u>See</u> <u>id.</u>; <u>see also</u> <u>Johnston</u>, 63 So. 3d at 744-45.

Bright has failed to prove that the juror in question was actually biased. Competent, substantial evidence supports the postconviction court's determination that the singular "tiny bit" comment did not prove actual bias in the context of the entire voir dire. Notably, the postconviction court judge was the same judge that presided over the jury selection process and was, therefore, in a better position to analyze the juror's demeanor and the genuineness of her answers, among other characteristics. <u>See</u> <u>Carratelli</u>, 961 So. 2d at 319 ("[T]he trial court 'has a unique vantage point in the determination of juror bias' that is unavailable to us in the record."). Furthermore, the postconviction court noted that it repeatedly instructed the jury that Bright was presumed innocent, did not have to present any evidence, exercised his fundamental right to remain silent, and that the jury could not take his

invocation of that right as an admission of guilt or allow it to influence the verdict. In addition, counsel testified that neither he nor his co-counsel nor Bright perceived a problem and that he would have otherwise expended one of his peremptory strikes. Therefore, this claim fails.

## 2. Cumulative Error

Last, Bright contends that the postconviction court erred in finding that he was not deprived of a fair trial as a result of cumulative errors during the guilt phase. We disagree. This Court has recognized under unique circumstances that where multiple errors are found, even if they are individually harmless, the cumulative effect can result in a constitutionally unfair trial. See Hurst, 18 So. 3d at 1015; see also McDuffie v. State, 970 So. 2d 312, 328 (Fla. 2007). However, this Court has repeatedly held that "where the individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error also necessarily fails." See Israel v. State, 985 So. 2d 510, 520 (Fla. 2008) (quoting Parker v. State, 904 So. 2d 370, 380 (Fla. 2005)); see also Griffin v. State, 866 So. 2d 1, 22 (Fla. 2003); Wright v. State, 857 So. 2d 861, 871 (Fla. 2003). In addition, individual claims that fail to meet the Strickland standard for ineffective assistance of counsel are also insufficient to establish cumulative error. See Israel, 985 So. 2d at 520. As discussed above, with regard to every guilt phase claim, Bright has

failed to demonstrate that the postconviction court erred in finding no <u>Strickland</u> error occurred. As a result, Bright has not presented a basis for cumulative error.

## CONCLUSION

We affirm the postconviction court's order and remand for a new penalty phase proceeding.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Duval County,
    Charles Warner Arnold, Jr., Judge - Case No. 162008CF002887AXXXMA

Pamela Jo Bondi, Attorney General, and Jennifer Lyn Keegan, Assistant Attorney General, Tallahassee, Florida,

    for Appellant/Cross-Appellee

Joseph Stewart Hamrick, Richard Adam Sichta, and Susanne Kaye Sichta of The Sichta Firm, LLC., Jacksonville, Florida,

    for Appellee/Cross-Appellant